IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

CONSERVATION NORTHWEST; and ) 
METHOW VALLEY CITIZENS ) No. 33194-6-III
COUNCIL, )
)
Appellants, )
)
v. ) UNPUBLISHED OPINION
)
OKANOGAN COUNTY, )
)
Respondent. )

FEARING, C.J. — This appeal asks the question, among others, of whether

Okanogan County sufficiently completed an environmental checklist, under the State

Environmental Protection Act (SEPA), chapter 43.21C RCW, when adopting an

ordinance permitting all-terrain vehicles (ATV) traffic on county roads in segments with

a speed limit of 35 m.p.h. or less. Our task is to apply the law rather than to choose a side

between ATV riding enthusiasts and environmental groups. In a painfully long opinion

necessitated by extended facts, a lengthy procedural background, and numerous legal

issues, we hold that, under SEPA rules, Okanogan County failed to satisfactorily prepare the environmental checklist. We respect the recreational value of ATVs and note that Okanogan County may still enact an ATV ordinance, but must complete a thorough environmental checklist.

## FACTS

We first introduce the parties. Defendant Okanogan County, located in north central Washington, is the largest Washington county and the fifty-fourth largest United States county by area. Okanogan County borders British Columbia to the north, the Columbia River to the south, Ferry County to the east, and the Cascade Mountains to the west.

Only thirty percent of the land within Okanogan County lies in private ownership due to state and federal land proprietorship. A portion of the Colville Indian Reservation sits in the southeast corner of the county.

The geographic features of Okanogan County include the Cascade Mountains, the Columbia River, the Okanogan River, and the Methow Valley. The Methow Valley serves as a destination for outdoor enthusiasts and offers hundreds of square miles of cross-country ski trails, snowmobile parks, mountain biking trails, and opportunities for snowshoeing, fishing, camping, and hiking.

Plaintiff Conservation Northwest (CNW) is a nonprofit conservation organization with offices and members in Okanogan County. Plaintiff Methow Valley Citizens

2

Council (MVCC) is a private nonprofit membership organization, established in 1977 to preserve the wildlife, waters, and farmland of the Methow Valley. Both CNW and MVCC members visit lands within Okanogan County for aesthetic enjoyment of nature. The two environmental organizations rely on the same data and forward the same legal arguments in this appeal.

Melanie Rowland signed a declaration on behalf of Methow Valley Citizens Council. Rowland, a MVCC board member and MVCC attorney, resides in Twisp. She explores state wildlife and forest lands and federal lands in Okanogan County for hiking, photography, bird and wildlife watching, and the study of native plants and trees.

George Wooten signed a declaration on behalf of Conservation Northwest and Methow Valley Citizens Council. Wooten, also a resident of Twisp, is a staff member of CNW and a member of MVCC. Wooten is a botanist who contracts with agencies and individuals for fuel mapping, plant and animal surveys, and wetland delineation. He also teaches biology classes, including botany, at Wenatchee Valley College North in Okanogan. Wooten visits conservation trust lands, state wildlife lands, state forest lands, and federal lands and roads in Okanogan County for the activities of hiking, photography, and observing birds, wildflowers, and native trees and plants.

Our statement of facts now moves to a recitation of recent law. On July 3, 2013, Washington Governor Jay Inslee signed into law Engrossed Substitute House Bill (ESHB) 1632, an act regulating the use of off-road vehicles (ORVs) in Washington.

3

LAWS OF 2013, 2d Spec. Sess., ch. 23, at 2865. In enacting ESHB 1632, the legislature

found:

> that off-road vehicle users have been overwhelmed with varied confusing rules, regulations, and ordinances from federal, state, county, and city land managers throughout the state to the extent standardization statewide is needed to maintain public safety and good order.

LAWS OF 2013, 2d Spec. Sess., ch. 23, § 1(1). Through ESHB 1632, the Washington

legislature sought to:

> (a) Increase opportunities for safe, legal, and environmentally acceptable motorized recreation; (b) decrease the amount of unlawful or environmentally harmful motorized recreation; (c) generate funds for use in maintenance, signage, education, and enforcement of motorized recreation opportunities; (d) advance a culture of self-policing and abuse intolerance among motorized recreationists; (e) cause no change in the policies of any governmental agency with respect to public land; (f) not change any current ORV usage routes as authorized in chapter 213, Laws of 2005; (g) stimulate rural economies by opening certain roadways to use by motorized recreationists which will in turn stimulate economic activity through expenditures on gasoline, lodging, food and drink, and other entertainment purposes; and (h) require all wheeled all-terrain vehicles to obtain a metal tag.

LAWS OF 2013, 2d Spec. Sess., ch. 23, § 1(2).

Section 6 of ESHB 1632 opened state highways, with a speed limit of thirty-five

miles per hour or less, to the operation of wheeled all-terrain vehicles (WATVs). LAWS

OF 2013, 2d Spec. Sess., ch. 23, § 6; *codified at* RCW 46.09.455(1). Section 6 of the

enactment also granted counties with a population of fifteen thousand or more the

authority to open county public roadways for WATV use. *Codified at* RCW

4

No. 33194-6-III
*Conservation Nw. v. Okanogan County*

46.09.455(1)(c)(i). RCW 46.09.455 now reads, in pertinent part:

（1）A person may operate a wheeled all-terrain vehicle upon any public roadway of this state, not including nonhighway roads and trails, having a speed limit of thirty-five miles per hour or less subject to the following restrictions and requirements:

. . . .

(c)(i) A person may not operate a wheeled all-terrain vehicle on a public roadway within the boundaries of a county, not including nonhighway roads and trails, with a population of fifteen thousand or more unless the county by ordinance has approved the operation of wheeled all-terrain vehicles on county roadways, not including nonhighway roads and trails.

. . . .

(iii) Any public roadways, not including nonhighway roads and trails, authorized by a legislative body of a county under (c)(i) of this subsection or designated as unsuitable under (c)(ii) of this subsection must be listed publicly and made accessible from the main page of the county web site.

. . . .

(e) Any person who violates this subsection commits a traffic infraction.
(2) Local authorities may not establish requirements for the registration of wheeled all-terrain vehicles.

ESHB 1632 took effect on July 28, 2013. FINAL B. REP. ON ENGROSSED SUBSTITUTE

H.B. 1632, at 6, 63d Leg., 2d Spec. Sess. (Wash. 2013).

ESHB 1632 employed the term "off-road vehicle" or "ORV" nearly

synonymously with "all-terrain vehicle" or "ATV," but ATVs are a subcategory of

ORVs. Under RCW 46.04.365,

"Off-road vehicle" or "ORV" means a nonstreet registered vehicle when used for recreational purposes on nonhighway roads, trails, or a variety of other natural terrain. "Off-road vehicle" or "ORV" includes, but is not limited to, all-terrain vehicles, motorcycles, four-wheel drive

5

vehicles, and dune buggies.

No Washington statute expressly defines "all-terrain vehicle." Nevertheless, ESHB 1632 introduced and defined the term "wheeled all-terrain vehicle" or "WATV." RCW 46.09.310(19) now declares:

> "Wheeled all-terrain vehicle" means (a) any motorized nonhighway vehicle with handlebars that is fifty inches or less in width, has a seat height of at least twenty inches, weighs less than one thousand five hundred pounds, and has four tires having a diameter of thirty inches or less, or (b) a utility-type vehicle designed for and capable of travel over designated roads that travels on four or more low-pressure tires of twenty psi or less, has a maximum width less than seventy-four inches, has a maximum weight less than two thousand pounds, has a wheelbase of one hundred ten inches or less, and satisfies at least one of the following: (i) Has a minimum width of fifty inches; (ii) has a minimum weight of at least nine hundred pounds; or (iii) has a wheelbase of over sixty-one inches.

On July 29, 2013, the day after implementation of ESHB 1632, the Okanogan County Board of County Commissioners adopted Ordinance 2013-10, which decreed that "all [county] public roadways and rights of way, or sections thereof, having a speed limit of 35 mph or less are approved and opened for the operation of wheeled all-terrain vehicles." CP at 195. At the time, Okanogan County managed 1,266 miles of roads within its borders, 335.73 miles of which ATVs could already use. Before enacting Ordinance 2013-10, the county did not conduct an environmental review under the SEPA.

On August 14, 2013, Conservation Northwest and the Methow Valley Citizens Council sued Okanogan County for declaratory and injunctive relief. The suit challenged

6

the validity of Ordinance 2013-10 in part because of the failure of Okanogan County to perform an environmental review. After CNW and MVCC moved for summary judgment, the county, on March 4, 2014, repealed Ordinance 2013-10, by adopting Ordinance 2014-3. The repealing ordinance mistakenly refers to the 2013 ordinance as Ordinance 2013-9, not 2013-10.

In April 2014, Okanogan County prepared a new ordinance, Ordinance 2014-7, which proposed to open 597.23 miles of county roads, including 165.03 miles of paved roads, for ATV use. On April 9, 2014, the county's SEPA responsible official, Director of the Office of Planning and Development Perry Huston, prepared a SEPA environmental checklist for the proposed ordinance. Environmental checklists assist government agencies in determining, before adoption of a proposal, whether the proposal will accrue "probable significant adverse impacts on the quality of the environment," thus necessitating an environmental impact statement (EIS) under SEPA. WAC 197-11-960; *see also* RCW 43.21C.030(2)(c). The checklist completed by Huston instructed him, in part, to:

> Answer the questions briefly, with the most precise information known, or give the best description you can.
> You must answer each question accurately and carefully, to the best of your knowledge.

CP at 253.

7

Because the sufficiency of the environmental checklist looms as the principal issue in this appeal, we quote lengthy portions of the checklist completed by Perry Huston in Appendix A. When asked to address the environmental impact of the ATV ordinance on various features of the environment, Huston sometimes answered: "The proposal involves existing roads located throughout Okanogan County." CP at 258. Huston then completed answers by stating no environmental impact would occur because ATVs would motor on preexisting roads. When a question asked Huston to identify environmental information prepared that relate to the ATV ordinance. Huston responded:

> There has been no other environmental information prepared relevant to this proposal. Any additional environmental information will be prepared if necessary to respond to issues identified during the comment period.

CP at 254.

In the environmental checklist, Perry Huston agreed that Okanogan County proposed no measures to reduce the environmental impacts of the ordinance. Huston wrote that the ordinance would cause little, if any, increase in the use of Okanogan County roadways. Huston failed to list any of the principal fauna and fora in the area and omitted any reference to endangered or threatened species, other than to mention that mule deer used the region as a migratory route. Huston attached to the environmental checklist a map of Okanogan County roads. He also attached twelve pages of spreadsheets listing the name, speed limit, length, and

8

surface type of some of the roads in the county. Presumably the spreadsheets listed those roads and the mileposts on those roads where the proposed ordinance would permit operation of ATVs.

On April 9, 2014, the same day as the completion of the environmental checklist, the Okanogan County Office of Planning & Development, through Department Director Perry Huston, issued a SEPA threshold determination of nonsignificance (DNS). The DNS concluded that proposed Okanogan County Ordinance 2014-7, the Opening ATV Routes ordinance, would not have a "probable, significant, and adverse environmental impact." CP at 282. Thus, Okanogan County did not intend to prepare an environmental impact statement.

On April 15, 2014, the Okanogan County Office of Planning & Development notified local government and tribal agencies of its threshold SEPA determination of nonsignificance and opened a comment period to extend through May 2, 2014. The Office of Planning & Development received numerous responses from government agencies and private parties.

The Confederated Tribes of the Colville Reservation commented that some of the roads that Okanogan County intended to open to ATVs jogged through tribal land and the Tribe's hunting and fishing grounds. Tribal law precludes the riding of ATVs on the lands and grounds. The Tribe apprised the county that it "vehemently opposes the opening of any roads for ATV use within the boundaries of the Reservation without

tribal consent." CP at 330.

The Town of Twisp's Planning Commission opposed Ordinance 2014-7 because of the potential adverse impacts on law enforcement and emergency services, insufficient regulation of vehicle maintenance, risk of increased accidents and death, and evidence that ATVs are unsafe when driven on paved surfaces. The Twisp Planning Commission wrote a letter to the Okanogan County Office of Planning & Development, which letter confirmed the town's opposition.

The Town of Winthrop Planning Commission preliminarily questioned the wisdom of the ordinance because of the lack of information. The Planning Commission wrote to Perry Huston and raised uncertainties about the assiduousness of the environmental checklist and encouraged the county to prepare a thorougher checklist. Winthrop criticized the checklist as assuming no environmental impact to the proximity of the roadways opened to ATV traffic, omitting any discussion of ATV use's interaction with other recreational activities, and failing to attempt to measure increased traffic. The letter emphasized one particular alleged shortcoming of the checklist:

> Since the proposal does not include a network of roads that connect in a way that creates contiguous routes, we are curious how the ATVs will arrive on these sections of road, and if there is any consideration of parking for trucks and trailers.

CP at 333. The full letter is attached as Appendix B.

On May 2, 2014, Methow Valley Citizens Council and Conservation Northwest

jointly submitted to the Okanogan County Office of Planning & Development detailed comments that echoed concerns of the Cities of Twisp and Winthrop. The full submittal is attached as Appendix C. The organizations wrote, in part:

> MVCC and CNW believe that in reaching a DNS, the County failed to analyze 1) the likelihood of significant impacts on sensitive lands and waters, including fish and wildlife habitat, from illegal off-road riding facilitated by opening certain roads to ATVs; 2) the impacts on traffic of ATVs traveling on roads with speed limits over 35 mph, either because of confusion over where ATVs are and are not allowed, or because the operator wants to traverse an unauthorized road segment with a higher speed limit to access an isolated authorized road segment; 3) the impacts on public services from the need for additional traffic patrol and enforcement to keep ATVs from riding off-road and the need to post signs indicating where ATVs are and are not allowed; and 4) the actual traffic impacts of additional vehicles on the roads that would be open to ATVs under this proposal.
>
> 1. The evidence of damage to lands, waters, vegetation, and fish and wildlife habitat from illegal off-road riding is overwhelming, and the County has failed to consider the significant impacts of illegal off-road riding that can be anticipated from opening roads in environmentally sensitive areas.
>
> In many responses in the SEPA Checklist, the County presumes that ATVs are exactly like all other vehicles that are already allowed on the roads and considers only the impacts to the road itself from opening the road to ATVs. On the contrary, the very name "all-terrain vehicles" means that these vehicles are designed, marketed and intended for off-road use. Unfortunately, not all operators stay on the road when they are riding in a vehicle that was designed and intended for off-road use, even when off-road use is prohibited. This statement is not speculation; it is established fact. In Appendix B we have included references to numerous studies and observations of damage to land from illegal off-road riding of ATVs. In light of the overwhelming evidence, it is simply unreasonable and inconsistent with SEPA to ignore the fact that illegal off-road riding is widespread and to assume that all ATV operators will obey all laws.
>
> For example, under the topic of Earth on page 3, the checklist asks about steepness of slopes, kind of soils affected, history of unstable soils,

likelihood of erosion, and measures to control erosion. Every response asserts that only "already existing roadways" will be affected. This view turns a blind eye to the probability of illegal off-road operation of ATVs. The evidence shows, however, that off-road riding is likely and that it will cause erosion, particularly in areas of steep slopes or unstable soils. Consequently, the County must assume some amount of illegal riding and assess impacts on soils adjacent to roads, especially in areas of steep slopes or unstable soils.

. . . .

The checklist continues in the same vein. In responses to questions regarding the next two elements - Plants and Animals - the County repeatedly asserts that there is no vegetation affected and no animals affected because ATV travel will take place on "existing county roadways." There is no consideration of impacts to vegetation or wildlife adjacent to, or made accessible by, existing roads. Once again, it is incumbent on the County to acknowledge that ATVs are not like most other vehicles in that they are designed and intended for off-road travel. The literature is replete with examples of serious damage to vegetation and, wildlife habitat - including spawning streams for endangered fish - from illegal off-road riding. (See especially studies referenced by Backcountry Hunters & Anglers, Appendix B.)

Other responses in the checklist fail to consider the likelihood of damage from off-road riding. On page 8, the checklist asks: "Has any part of the site been classified as an environmentally sensitive area? If so, specify." The County's answer is: "No roadways in this proposal have been classified as sensitive areas."

. . . .

Many miles of roadways in the proposal travel through, or give access to, Washington Department of Fish & Wildlife (WDFW) Wildlife Areas or state parklands. (See attached road list, Appendix A that shows roads in the proposal that access these public lands in the Methow Valley.) Surely there are environmentally sensitive areas on these lands, but the County has failed to ascertain the extent to which these areas may be adversely affected by off-road riding facilitated by this proposal. WDFW and State Parks prohibit ATVs both on and off road, yet the proposal would provide ATV access to and through these lands, thus creating an enforcement nightmare for these agencies.

Many other miles likely are adjacent to spawning streams of at least one of the County's three federally listed threatened or endangered fish

species, but the County has failed to do any surveying or mapping to determine what protected species or their habitat may be made vulnerable to ATV access by this proposal. On page 14, the checklist asks: "How would the proposal be likely to affect land and shoreline use, including whether it would allow or encourage land or shoreline uses incompatible with existing plans?" The County response is: "The county roads are in some cases located next to areas, under shoreline protection." This is another example of sensitive areas that may be affected by the proposal.

In sum, there is no rational basis for assuming that there will be no damage to adjacent or accessed lands from illegal off-road riding. To the contrary, there is ample evidence that the only reasonable assumption in conducting a SEPA analysis on this proposal is that there will be some illegal riding and consequent damage to soils, water bodies, shorelines, vegetation, wildlife, protected species, and governmentally protected sensitive areas. To reduce the likelihood of that damage, MVCC and CNW request that roads that travel through, or provide access to, WDFW lands or state parklands be removed from this proposal. In the alternative, we request that the County conduct a comprehensive survey to determine where roads give access to sensitive lands, waters, or fish and wildlife habitat and remove those roads from the proposal.

2. The County failed to consider the impacts on traffic of ATVs traveling on roads with speed limits over 35 mph, either because of confusion over where ATVs are and are not allowed, or because the operator wants to cross a segment with a higher speed limit to access an isolated open segment.

The proposal includes many isolated short segments that allow longer rides only if the operator illegally rides on roads that have speed, limits over 35 mph. (See Appendix A for a list of these roads in the Methow Valley.) It is likely that some riders will ride on segments or roads with higher speed limits, either because of confusion over where ATVs are and are not allowed, or because the operator wants to traverse an unauthorized segment with a higher speed limit to access another authorized road or segment. The County has not indicated intent to install signs to make it clear where ATVs are not allowed, and to do so would be prohibitively expensive. The County assumed that despite the disconnected patchwork of short segments connected only by roads or segments with higher speed limits, all ATV riders would both 1) understand where they may and may not ride, and 2) stay only on roads on which ATVs are allowed. This is an unsupported and unrealistic assumption.

13

. . . .

To correct this error, MVCC and CNW request that the County remove from the proposal all road segments less than two miles long and those loop roads which connect only to roads with speeds greater than 35 mph. Those segments for the Methow Valley are shown in Appendix A (columns K, L, and N).

3. The County failed to consider the impacts on public services of the need for additional traffic enforcement to keep ATVs from riding off-road and to post signs indicating where ATVs are and are not allowed.

Already thin local police and sheriff resources will be needed to enforce the laws governing ATVs. . . .

4. The County failed to consider the actual traffic impacts of additional vehicles on the roads that would be open to ATVs under this proposal.

The County admits that it does not know the number of additional vehicle trips per day or at peak times (e.g., weekends and holidays in spring, summer, and fall), and it made no attempt to estimate those numbers. (See page 11, response to question 14.f: "It is not known the total number of vehicle trips per day generated by this proposal. . . . It is likely peak volumes will occur during daylight hours in the spring, summer, and fall.") Consequently, the County does not know whether the increase in traffic by itself - even without off-road riding - will increase impacts to environmental elements such as road surface erosion, dust irritants, animal/vehicle collisions, or other environmental elements. Yet the County states without evidence that "there is no erosion anticipated as a result of this proposal" (page 3, response to question 1.f) and that "the number of average daily trips is not anticipated to increase to a point where vehicle density on the roads will cause a significant increase in animal/vehicle collisions." (Page 6, response to question 5.a, b, and c, and page 13, response to question 2)

Surely there is information available on the amount of traffic generated by opening roads to ATVs, since there are 336 miles of roads in the County that are already open to ATVs. . . .

Requested Action

MVCC and CNW request that you withdraw the DNS and issue a Determination of Significance on the proposal. Following that determination, we ask that you either 1) prepare an environmental impact statement for the proposal, or 2) issue a new proposal and prepare a SEPA analysis for the new proposal, including a request for public comment.

> The new proposal should:
> Remove all roads in Appendix A that are shown in red. (The reason for removing a road from the proposal is shown in the columns following the road name. There may be more than one reason for removing a particular road.) In particular, we request that roads that travel through, or give access to, WDFW lands or state parklands be removed from this proposal. In the alternative, we request that the County conduct a comprehensive survey to determine where roads give access to sensitive lands, waters, or fish and wildlife habitat and remove those roads from the proposal.

CP at 336-40 (footnote omitted).

With its May 2, 2014 letter, CNW and MVCC submitted a summary of scientific literature addressing the impact of ATV off-roading anywhere and damage particularly caused on national forest lands in Okanogan County. The literature provided information about emerging best practices for managing ATV recreation in forestlands, the historical impacts of off-road recreation on wildlife habitats, and the environmental and social effects of ATVs in general. A June 7, 2013 article from the United States Forest Service website reported the growing instances of "mudding" in the Methow Valley. "Mudding" entails ATV operators trekking off-trail in order to plunge through large puddles and fling as much mud into the air as possible.

CNW and MVCC also enclosed, with its objections, an annotated catalogue of the roads identified in Okanogan County's proposed ordinance. The road inventory listed those county roads slated for ATV use that connected with roads with a speed limit of greater than thirty-five miles per hour and itemized roads planned for ATV travel that

15

incorporated segments traversing less than two miles or crossed land managed by

Washington's Department of Fish and Wildlife (WDFW). The two environmental groups

proposed opening fewer roads to ATVs than planned by Okanogan County.

WDFW also submitted comments to Perry Huston. The Department wrote:

The Washington Department of Fish and Wildlife (WDFW) appreciates the opportunity to review and comment on the proposed ordinance to open approximately 597 miles of existing roads in Okanogan County to all-terrain vehicles (ATVs). We believe that substantial impacts as discussed below will likely occur if the ordinance is approved. WDFW's comments are based from the experience gained after managing lands that were impacted by the original ATV ordinance [2013 ordinance], which opened the road through the Sinlahekin Wildlife Area. Our comments reflect actual impacts that have been experienced, and are continuing. We anticipate these impacts will increase as additional roads as proposed are opened through Wildlife Area lands. WDFW lands in Okanogan County are not open to ATV use, with rare exception, and this ordinance will bring ATV riders, often unknowingly, into conflict with State law.

ATVs are capable of being driven on road-less terrain and more primitive trails than full sized vehicles. ATV use on primitive trails and road-less areas can cause erosion, soil disturbance; new trailing in unsuitable areas; and spread noxious weeds. ATVs are particularly problematic because they contribute to the spread of noxious weeds. A vehicle used off-road in an area with noxious weeds will transport and spread seeds to other areas. Off-road use in a previously weed-free area can disturb soil and create an idea situation for transported weed seeds to grow and flourish. Noxious weeds on WDFW lands has been a concern voiced by Okanogan County; this ordinance will add to the weed problem on state and private lands associated with the roads open to ATV use.

Some roads and trails are inappropriate for ATVs because of conflict with other users such as horse riders, bikes, and hikers. Increased disturbance to wildlife and livestock can occur. Neighboring landowners have complained about existing ATV riders coming off state lands, cutting their fences, and leaving gates open. This has resulted in scattered livestock and increased costs for fence repairs and livestock gathering.

16

Access to remote and "out-of-sight" areas by ATVs, increases the threat of vandalism, theft, youth parties, accidental wildfire ignitions, and other undesirable behaviors.

Access to roads, trails, and landscapes by ATVs will be increased by the proposed ordinance. While we acknowledge there are responsible individuals in all user groups, there are the minority of individuals who will act irresponsibly. Currently, inappropriate off-road uses and using roads and trail that are illegal for ATVs is a common problem across the state. The added costs to land management activities and enforcement have not been mitigated and no such mitigation appears to exist within the. Okanogan County proposal. Wider access to private and non-county roads, trails, and landscapes will have corresponding increases in illegal uses with the negative consequences mentioned above. We are particularly concerned with impacts to WDFW owned boat launches, fishing access, and Wildlife Areas. Private and non-county landowners adjacent to the proposed roads will have increased costs for posting land, gating roads, and controlling weeds spread from the roadway.

The original ordinance placed an increased burden on WDFW enforcement staff associated with illegal ATV use on WDFW lands adjacent to roads recently opened to ATV use by the county. As there is no proposed added enforcement capacity to ensure that these ATVs do not trespass or violate other regulations, including traffic rules, enforcement, will rarely occur. The increased burden on other enforcement agencies to ensure that ATV users comply with existing laws will be significant. Therefore, WDFW is asking Okanogan County to delay opening any new roads to ATVs which would cross or contact lands we are charged with protecting, based upon our Sinlahekin Road experience. We would further ask that this delay be for the purpose of working with WDFW and the Sheriff Department to find ways to minimize, or mitigate, for impacts to wildlife, lands, non-motorized users, grazing lease holders, and our budget and staffing resources. Also, for the County to provide for enforcement-response needs, which will be needed as a result of any new open roads.

CP at 367-68.

Former WDFW employee Tom McCoy wrote to Okanogan County and urged rejection of an ATV ordinance. McCoy e-mailed the Board of Commissioners:

17

I have recently been made aware of the SEPA checklist prepared for you[r] intended opening of under 35mph roads to ORV's in Okanogan County. I believe there are several glaring deficiencies in that document, most notably is the fact that it relies on voluntary compliance to these new rules.

As the former manager of the WDFW Methow Wildlife Area I witnessed first hand the result of your prior decree [2013 ordinance] to open county roads to ORV's. In the first three week following that declaration I received more calls about ORV's on non-county roads, reckless driving on all roads, driving off-road, and driving on closed roads than I had in the previous three years. As an example, last fall, I witnessed four individuals on two ORV's spinning 360's on upper Bear Creek Rd. on their way from Pearrygin State Park to the WDFW shooting range where they traveled off road to get behind the road closure barrier on USFS Rd. 100 up to Sullivan's Pond. This was not an isolated incident. On multiple occasions I have witnessed ORV use, both on and off-road, on closed USFS and WDFW property. The SEPA checklist appears to assume that because there is a county ordinance that all users will comply. Considering that there is a substantial measure of non-compliance to well established, posted, and enforced, standard traffic laws by currently street legal vehicles it can be considered nothing but folly to assume that ORV riders will fully comply with similar rules.

Opening roads to ORV users, without due consideration of non-compliance and impacts to critical fish and wildlife habitat will have more than "speculative impacts." In fact, non-complying ORV use is currently having impact critical habitat. To not acknowledge that issue in the SEPA checklist is inappropriate. I am by no means against ORV use on county roads, far from it, but as elected officials you need to be realistic and objective, and act accordingly in the interest of all citizens of Okanogan County.

CP at 363.

George Wooten sent written comments to the Okanogan County Office of

Planning & Development. Wooten claimed that the proposed ordinance encouraged

unlawful use of ATV trails across Highway 20 in Okanogan County. To support his

18

claim, Wooten attached a photograph showing an unauthorized trail connecting to a state road, which prohibited ATV use. Wooten also attached a message from a state forester that confirmed the popular nature of the unauthorized ATV trail. Wooten presented a photograph of another unauthorized trail across a wetland. Finally, Wooten mentioned pavement is not a safe surface for ATVs, since ATVs are manufactured for off-road use.

Other county residents, unaffiliated with CNW or MVCC, also expressed concern about Okanogan County's proposed ordinance. Nancy Soriano asked for exclusion of seven roads from the ordinance because use would negatively impact sharp-tailed grouse, a threatened species that Okanogan County must protect under the Washington Growth Management Act, chapter 36.70A RCW. Soriano mentioned that ATVs have caused wildfires by driving in dry grass. She noted the difficulty of enforcing laws in rural areas.

Thirty-four citizens, primarily through succinct e-mail, expressed support for Ordinance 2014-7 in comments to the Okanogan County Office of Planning & Development. Supporters noted the utility of ATVs in assisting senior citizens in accessing the outdoors and the prospect of increased economic growth from ATV tourism. Okanogan County Sheriff Frank Rogers expressed no concerns about opening more county roads to ATVs, but stated that Sheriff Deputy Dave Rodriguez, not him, enforced ATV rules. Rodriguez did not comment. Three local snowmobile clubs and an ATV club voiced support for the ATV ordinance. A sample of ATV ordinance supporter comments is found in Appendix D.

19

On May 14, 2014, Okanogan County issued a final DNS and published the determination in the official county newspaper. On May 29, 2014, CNW and MVCC appealed the SEPA DNS, pursuant to Okanogan County Code 14.04.220, to the Okanogan County Board of County Commissioners.

In their appeal to the county commissioners, the two environmental organizations contended that, in issuing a DNS, Okanogan County failed to engage in a meaningful analysis of whether: (1) increased ATV travel would damage sensitive lands, waters, and wildlife habitat, (2) ATVs would travel on unopened roads in order to access authorized ATV routes, (3) increased ATV traffic would require additional public services and law enforcement, and (4) increased ATV use would affect overall traffic patterns and congestion on roads with speed limits of 35 m.p.h. or less. CNW asked the Board of County Commissioners to find the current DNS clearly erroneous, withdraw it, and issue a determination of significance. The duo groups requested that Okanogan County either prepare an EIS for Ordinance 2014-7 or propose a new ordinance and prepare another environmental checklist. The Okanogan County Board of County Commissioners scheduled a public hearing on the appeal for June 16, 2014.

During the pendency of the appeal before the Okanogan County Board of County Commissioners, CNW and MVCC tendered additional public comments, declarations, and scientific literature related to the proposed ATV ordinance. Much of the scientific literature assumed operation of ATVs on dirt trails, which Okanogan County insists will

20

not result from its ATV ordinance. The submitted literature included a dense 2011

compilation by Backcountry Hunters & Anglers of scientific studies addressing the

environmental impact of ATVs. The compilation read in part:

> Natural resources are affected by ATV use (Meadows et al. 2008).
> All-terrain vehicle use affects soil and hydrologic function primarily
> through soil compaction, increased soil strength, and removal of the forest
> litter layer in temperate environments (Ouren et al. 2007). Soil compaction
> and the removal of the forest litter layer can reduce vegetation growth
> (Webb et al. 1978) and is a primary factor in accelerated erosion rates
> (Megahan 1990). . . .
> . . . .
> All-terrain vehicle travel increases erosion and sediment
> concentrations by removing soil cover and compacting the soil thus
> decreasing infiltration. Sediment delivery to streams via erosion is a result
> of ATV travel (Misak et al. 2002). Increased sediment loading decreases
> water quality, fish habitat quantity and quality, and fish reproductive
> success (Newcombe and MacDonald 1991). The increase in runoff and
> sediment transport can be substantial. Meadows et al. (2008) compared the
> effects of ATV traffic across seven sites on diverse landscapes ranging
> from the Wenatchee National Forest in Washington State to the Land
> Between the Lakes in Kentucky and concluded that "ATV trails are high-
> runoff, high sediment producing strips on a low-runoff, low sediment
> producing landscape." . . .
> . . . .
> Impacts of ATV traffic on water quality and aquatic systems are not
> limited to increases in suspended stream sediments. ATV trails funnel
> water that dislodges contaminants which end up in streams, rivers and lakes
> (Ouren et al. 2007). Contaminants can also be directly introduced into
> aquatic systems through oil and fuel spills and wind deposition of emission
> particulates that are transported in dust migration, settle onto vegetation,
> and subsequently washed off leaf surfaces by rain and snow and moved by
> surface water run-off. All-terrain vehicle operation in or near streams and
> waterways poses a serious water pollution threat (Havlick 2002). This can
> have detrimental impacts on populations of aquatic animals. Garrett (2001)
> (as cited in Taylor 2006) reported that environmentally sensitive aquatic
> species (including fish) were absent from OHV impacted sites on the

21

Nueces River in Texas, while unimpacted sites hosted numerous environmentally sensitive species. . . .

. . . .

ATV impacts on vegetation are not limited to removal of vegetative soil cover. Reduced plant growth rates and populations of native species coupled with increases in non-native and pioneering plant species are directly related to ATV travel (Ouren et al. 2007). . . .

. . . .

This review of the impact of ATV use on the physical environment suggests that the impacts are not only universal and cumulative, but that much of the damage associated with their operation can be induced by a limited number of users over short time periods. . . . For example, Meadows et al. (2008) asserts that while a meadow may recover from a single pass in a relatively short time frame, multiple passes often result in damage that natural processes are unable to mitigate. . . .

. . . .

Restricting ATV use in areas of low road density is necessary to reduce the spread of invasive species and protect the community structure of native species.

. . . .

Restoring sites degraded by ATV's is unfeasible as long as ATV use continues.

. . . .

All-terrain vehicle travel can have a profound effect on all forms of wildlife. . . .

. . . Habitat fragmentation can disrupt wildlife movements between and within habitats (Forman and Alexander 1998; Jackson and Griffin 1998), which can have negative consequences for endemic species and may encourage non-native and invasive species propagation (Lovallo and Anderson 1996; Jackson and Griffin 1998). . . . Habitat fragmentation can reduce reproductive success among nesting birds and is believed to be the main culprit in population reductions in some species of forest birds (Robinson et al. 1995).

. . . .

. . . According to Trombulak and Frissel (2000), animal behavior is modified through five mechanisms:
1. altered movement patterns
2. changes in home range
3. altered reproductive success

> 4. altered escape response
> 5. altered physiological state
>
> . . . .
>
> The effect of ATV travel on elk, and more generally, the effect of roads on elk, has been a focal point for researchers because of the documented aversion elk have to roads open to motorized travel (Cole et al. 1997; Rowland et al. 2000), and for their social, economic, and recreational importance (Naylor et al. 2009). . . .
>
> . . . .
>
> Elk (especially economically and biologically significant bull elk) preferentially use areas devoid of motorized activity.
> Elk require large blocks of non-motorized habitat for security. . . .

CP at 73-89. A less abridged version of the Backcountry Hunters & Anglers report is attached as Appendix E.

MVCC and CNW also proffered to the Okanogan County Board of County Commissioners an annotated bibliography prepared by a student at the University of Vermont School of Natural Resources. The paper compiled and cited research related to the environmental and social impact of ATV use on public and private land. The bibliography reproduced summaries and citations of academic articles, white papers, websites, and organizations studying the social and environmental effects of ATVs. Among other observations, the studies noted that ATV use coincided with the nesting times of birds causing nest desertion.

CNW provided the Okanogan County Board of Commissioners a June 7, 2013 release from the Okanogan-Wenatchee National Forest office in Winthrop. The release read, in part:

23

Mudders, take note: It is against the law to tear up forest roads and meadows for the fun of it, and the legal and financial consequences can be steep. Tearing up high-country meadows with four-wheel-drive and off-road vehicles destroys wildlife habitat and ecosystems.

During a recent investigation, Law Enforcement officers gathered information about mudding that occurred over Memorial Weekend northwest of Buck Lake Campground, near Winthrop Washington. The meadow was torn up by vehicles; here there was green grass, there are now mud pits and tire tracks. The activities that caused this damage are illegal under both state and federal law. Participants could face charges including malicious mischief and fines up to and including paying for the costs of restoration.

. . . .

Spinning tires on plants destroys the plants, leaving behind bare dirt. When plants are gone, there is nothing to stop soil from washing into nearby streams and lakes. Muddy streams and lakes are bad for fish, wildlife, irrigators, recreationists, and towns dependent upon clean water and tourism for survival. When native plants are gone, noxious weeds move in. A meadow of native grasses and flowers may soon become a field of thistles and knapweed.

Mudding compacts soil. Healthy soil should bounce a bit when you walk on it. Tire tracks create hard, dried up soil. This hard soil doesn't allow water to move into the ground. Instead, water runs down tire tracks and into creeks and lakes, carrying mud and pollutants with it. It is hard for plants to grow in compacted soil-imagine trying to extend your legs through a concrete floor.

Meadows and wetlands provide important breeding, rearing, and foraging habitats for many birds and other animals. Tearing-up these areas removes nesting and hiding cover, decreases forage, interferes with feeding, and pushes animals out into areas where they may not survive.

Restoring an area damaged by mudding is expensive. Smoothing ruts, reseeding or planting and repairing roadbeds costs a lot of money. In situations where the individuals are not caught, every taxpayer has to pitch in to cover the restoration costs. When caught, individuals responsible for the damage can be fined up to $5000. In addition, the U.S. Forest Service may bring a civil suit against the individual to pay for the costly restoration.

CP at 150-51.

Okanogan County residents who allegedly observed damage caused by ATVs submitted letters and photographs to the Okanogan County Board of County Commissioners. The letters are attached as Appendix F.

CNW and MVCC also provided the Okanogan County Board of County Commissioners with releases from ATV trade associations, the U.S. Consumer Product Safety Commission, and private safety institutions warning of significant dangers associated with operating ATVs on paved road surfaces. The Consumer Product Safety Commission explained:

> ATVs should not be driven on paved roads. ATVs on paved roads are at risk of being hit by cars and other vehicles. While passenger vehicles contain safety features designed to protect occupants from collisions, ATVs do not. If struck by other vehicles, ATV riders can be killed or severely injured.
>
> In addition, most ATVs have low pressure tires and a solid rear axle, where both wheels turn at the same speed. When making a turn, the ATVs inside rear wheel is intended to skid because its path length is less than the path length of the outside wheel. ATVs on paved surfaces have much better traction, which prevents the necessary skidding. This can make turning an ATV on paved surfaces unpredictable and unstable.
>
> For these reasons, some states and local areas prohibit ATVs and other off-road vehicles on public streets and highways.

CP at 175.

The Specialty Vehicle Institute of America prepared a position paper in opposition to ATV use on roads, which paper the Okanogan County Board of County Commissioners received. The paper read, in part:

> The Specialty Vehicle Institute of America (SVIA) is the national

not-for-profit trade association representing manufacturers and distributors of all-terrain vehicles (ATVs) in the United States. SVIA's major goal is to promote the safe and responsible use of ATVs.

. . . .

ATVs are designed, manufactured and sold for <u>off-road use only</u>. On-road vehicles must be manufactured and certified to comply with U.S. Department of Transportation Federal Motor Vehicle Safety Standards (FMVSS). These safety standards consist of extensive and detailed compliance requirements. Since ATVs are not intended to be used on-road, they are not designed, equipped or tested to meet such standards. Permitting on-road use of ATVs, including modified ATVs, would be in conflict with manufacturers' intentions for their proper use, and would be contrary to federal safety requirements.

. . . .

SVIA emphasizes that ATVs are not designed, manufactured, or in any way intended for use on public streets, roads or highways and urges that on-highway use of ATVs be prohibited and that law enforcement efforts be strengthened to eliminate this dangerous practice.

CP at 173-74.

Fourteen ATV safety and health care professionals urged the Okanogan County Board of County Commissioners not to allow ATVs on public roads on public safety grounds. A copy of the letter is Appendix G.

Botanist George Wooten submitted to the Okanogan County Board of County Commissioners photos and exact geographic coordinates of purported existing illegal ATV routes along Highway 20 and coordinates for other illegal ATV routes loping between national forest lands and private property. In the additional records delivered to the Okanogan County Board of County Commissioners, county residents related episodes

when ATV operators rode in unauthorized areas. Residents reported delayed responses

by county law enforcement officers to these violations.

In response to CNW's and MVCC's appeal to the Board of County

Commissioners, county SEPA official Perry Huston penned a staff report recommending

that the county commissioners deny the organizations' appeal. The staff report read, in

part:

> Most of the issues raised by the appellants [CNW and MVCC] rely on the assumption that illegal ATV operation will result from the approval of this proposal which opens existing roads to ATV use. The appellants rely on this assumption to then assert the County failed to consider the likelihood that widespread damage to the environment would result from illegal ATV use. The appellants [then] rely on this assumption to assert that the County did not conduct an adequate review under SEPA because it failed to issue a DS and prepare an Environmental Impact Statement to identify and mitigate probable, significant, and adverse impacts brought about by illegal ATV use.
>
> The proposal submitted by the County for environmental review would open only existing roadways with a speed limit of 35 mph or less to use by licensed operators of licensed ATV's. No other restrictions are repealed or other privileges granted. Based on this proposal the environmental checklist was prepared and considered. The DNS under appeal was issued based on review of this information and a public comment period was conducted to gain additional information for further review.
>
> Information submitted during the SEPA comment period did not identify any environmental issues that were not considered or any probable, significant, and adverse impacts that would be caused by the proposal.
>
> Some of the comments received during the comment period that are relevant to the question are summarized in the following. All comments received were considered and are made part of the record.
>
> . . . .
>
> Washington State Fish and Wildlife personnel offered a comment stating they had concerns about increased enforcement costs brought about

by increased illegal ATV use. The comment offered no specifics other than there was an "increase" in illegal ATV use.

A past manager of WDFW offered a comment that when the roads were previously opened last summer there was more illegal ATV use than in the "previous three years." Neither activity level was quantified.

The Confederated [T]ribes of the Colville Reservation offered a comment that the reservation was closed to ATV use by non-tribal members and illegal use would result in damage to the environment and tribal resources. No information regarding the number or frequency of the incidents of illegal ATV use was provided.

The Methow Valley Citizens Council offered a comment that illegal ATV use would result in environmental impacts but offered no information in terms of the number or frequency of the incidents to which they refer.

There were other comments offered in a tone similar to those noted above. None of the commenters offered specific statistics or other analysis quantifying the concerns.

No information obtained through the public review process effectively quantifies the number of additional ATV riders anticipated in Okanogan County at any time that would result from the adoption of this proposal. Both proponents and opponents of the proposal suggest that there may be many but no specific information has been offered.

The appellants assert that a large influx of riders will come to the Okanogan County and a substantial portion of them will operate their ATV's in unlawful areas. Further the appellants assert that a significant portion of the unlawful use will take place in environmentally sensitive areas. There is no information contained in the proposal or gathered during the public comment period that would support a conclusion that the proposal will likely result in an increase in illegal ATV use or that the illegal use will result in probable, significant, and adverse impacts to the environment. As noted previously in this report the assertions made by the appellants' [sic] are dependent on these two speculative assumptions. Further, to reach the conclusion asserted by the appellant's [sic] one would have to assume that the illegal ATV operation would take place in a significant amount of environmentally sensitive areas such as wetlands or nesting sites, etc.

In addition to the speculative nature of the comments the comments received are in conflict. The Okanogan County Sheriff, chief law enforcement officer for the County, submitted a comment stating he had no concerns with the proposal. Others as noted offered concerns but no

specific information. Given the general nature of the comments the assertion that illegal ATV use will significantly increase as a result of opening existing roads to ATVs is speculative. As this assertion is speculative the assertion that illegal ATV use will result in probable, significant, and adverse impacts to the environment is speculative as well.

In addition to the speculative nature of the issues raised by the appellants any assessment of environmental impacts that takes the approach that any protective regulation or conditions of approval will be ignored therefore probable, significant, and adverse impacts will occur is problematic. Such an approach would render moot any effort to mitigate environmental impacts or reliance on existing regulation to protect the environment and promote public health and safety. If a party need only assert that no one will obey the law or conditions of approval in the course of a project/proposal review than it leaves the only alternative the denial or unreasonable curtailment of the project/proposal. The use of SEPA in such a manner would render a thoughtful environmental review and subsequent conditioning of a project/proposal difficult at best if not impossible to conduct.

As noted in Arthur Gresh v. Okanogan County and Mazama Properties L.L.C. Okanogan County Superior Court No 11-2-00491-2 the court stated "the court will not speculate that public agencies will not do their duty or that property owners will necessarily ignore the plat limits" in response to the assertion by the plaintiff that negative impacts will result because the (plat) conditions will not be followed and/or will not be adequately enforced. In the Amicus brief filed by the Department of Ecology for this same case the footnote on page 14 states Ecology agrees. . . . The Superior Court was correct in pronouncing . . . that courts "may not speculate that public agencies will not do their duty or that property owners will not necessarily ignore the plat limits. . . .["]

The discussion by the court in "Gresh" is "on point" here as well. The law prohibits unlawful ATV operation and protects critical areas. An appeal brought on the premise that these laws will be ignored, but apparently the laws that currently close the roads is respected, is problematic on its face.

The proposal if adopted would allow the operation of properly licensed/equipped ATV's by properly licensed operators on qualified county roads. The concern that the same operators who observe the existing road closures would not observe other regulation if the road closures were removed is at any rate not an environmental impact to be

29

further analyzed or mitigated.

**Conclusion**

The SEPA process is required to provide a reasonably thorough discussion of probable, significant, and adverse impacts brought about by a project/proposal. The SEPA review considered the areas of concern enumerated on the environmental checklist and the impacts suggested during the public comment periods.

The final decision regarding the proposal has not been made. The comments made by the agencies and members of the public are part of the record to be considered by the Board of County Commissioners prior to approving, amending, or denying the proposal.

The appellants in their request for relief ask that a DS be issued and an Environmental Impact Statement be prepared. They assert the responsible Official was clearly erroneous in the decision to issue a final DNS for the proposal. The appellants are correct that the standard for review is a "clearly erroneous" standard and the definition they provide of the meaning of that phrase is accurate as well. However, the conclusion that the decision of the SEPA responsible Official is clearly erroneous can only be made in view of the entire record and the public policy contained in the statute authorizing the decision. As noted earlier the purpose of the legislation authorizing counties to adopt ordinances such as the one under review was to promote public safety and reduce confusion. The appellant's [sic] assertion that in implementing the decision authorized by law; a decision authorized for the purpose of enhancing public safety, reducing confusion, and enhancing a self-policing approach to ATV operation will in fact accomplish the exact opposite is completely contrary to the public policy contained in the statute.

The appellant's [sic] assert that issues enumerated in the environmental checklist were not analyzed. Their assertion is incorrect. The issues were not analyzed to their satisfaction but the appellant's [sic] did not identify any issues that were not considered. Their assertion that an EIS must be prepared to consider issues not dealt with in the environmental review is without merit.

To prepare an environmental impact statement as requested by the appellant's [sic] three assumptions would have to be made and those assumptions quantified in some manner. The necessary assumptions would be:

1) That a significant increase in the number of ATV's and the intensity of their use would result from adoption of the proposal.

2) That a significant number of the ATV's would be operated in an unlawful manner.

3) That a significant number of unlawful ATV operators would leave the roadway and operate the ATV's in a significant number of environmentally sensitive areas.

Preparing an EIS based on the unsubstantiated assertion that the above listed speculative occurrences are likely is not required by law. In fact the SEPA statutes contain language directed to the specific objective of preventing the SEPA process from considering speculative impacts in an effort to prevent SEPA from becoming a tool of the obstructionist. The preparation of an EIS that attempts to quantify this sort of speculative impacts would be a daunting if not impossible task and would clearly be for the purpose of rendering the review so cumbersome and/or expensive that the proponent would simply abandon the project/proposal as untenable. In the end the EIS would impose conditions or cite existing regulation that mitigates the feared environmental impacts which brings us back to the appellant's [sic] "point of beginning." Attacking the adequacy of an environmental review on the basis that no one will honor the law or conditions imposed is without merit and contrary to the law.

In the case of this proposal and subsequent environmental review the preparation of an EIS would not add materially to the discussion. The issue that unknown impacts have not been identified has not been raised. In fact, the issues involved are clearly identified and understood. The issues involved have been discussed and the information generated has become part of the record. The lack of an EIS has not impaired anybody's ability to participate in the process or compromised an understanding of the consequences the opponents of the proposal fear. The lack of an EIS has not compromised the appellant's [sic] ability to enter their concerns and any information that supports their view into the record.

The appellant's [sic] assertion that the environmental checklist was inadequate and/or inaccurate is premised on their assertion that the speculative impacts identified are likely. This assertion is premised on the assumption that ATV operators will ignore all or most regulation. The challenges with this issue have been previously discussed and I will not repeat those points here. As their first premise is invalid there is no reason to believe the checklist is either inaccurate or inadequate.

The appellant's [sic] assertion that ATV operators may have to cross roadways with a speed limit greater than 35 mph is accurate but the environmental impact they fear it creates is unclear. Any motor vehicle

31

operator; or non-motorized vehicle operator for that matter, that operate on the road system must cross roadways with greater or lesser speed limits than the one they are on. The "rules of the road" adopted in statute are adopted to govern that type of vehicle operator interaction. In fact the statute that authorizes the proposal under review specifically contemplates that such a scenario will occur and provides direction on how to deal with it.

The appellant's [sic] request that all paved roads be removed from the proposal would seem contrary to their stated desire to reduce environmental impacts. The discussion provided by this staff report is applicable to this issue so I will not repeat them here.

All process requirements for environmental review were followed. This is not disputed by the appellants.

The appeal brought by the MVCC and CNW fails to provide any compelling evidence that would lead a reasonable person to conclude the SEPA Responsible Official made a "clearly erroneous" mistake in conducting the SEPA review. The appellant's [sic] have failed to demonstrate that any mistake made was an "egregious error" in terms of compromising the public's ability to participate in the process or in preventing the "reasonable thorough discussion" of environmental impacts to occur.

The appellant's [sic] have failed to overcome the deference given by law to the decision of the SEPA Responsible Official that an EIS was not necessary for this proposal and that a Final DNS was appropriate.

The appeal should accordingly be denied.

CP at 319-23.

On June 16, 2014, the Okanogan County Board of County Commissioners entertained, at a public hearing, CNW's and MVCC's appeal. During the hearing, Okanogan County's SEPA official stipulated that the two groups held standing in that forum. Members of the organizations appeared at the Board of County Commissioners hearing.

On June 23, 2014, the Okanogan County Board of County Commissioners denied

CNW's and MVCC's appeal of the DNS and adopted findings of fact and conclusions of

law. The county commissioners found, in part:

> 12) The Board found that the SEPA process was conducted in accordance with the law and provided a reasonably thorough discussion of the probable, significant, and adverse impacts caused by the project proposal.
> 13) The Board found that the decisions made by the SEPA Responsible Official were proper and consistent with applicable codes and statutes.
> 14) The Board determined that decisions made by the responsible official were entitled to substantial weight.
> 15) The Board found the evidence presented by the appellants failed to establish a correlation between the increase in lawful riding opportunities for ATV operators and an increase in illegal riding activity.
> 16) The Board found that the appellant's [sic] failed to produce compelling evidence that established the legislature was wrong in their finding that an increase in lawful riding opportunities would decrease the amount of unlawful or environmentally harmful riding activity and advance a culture of self-policing.
> 17) The Board found that the appellant's [sic] failed to produce compelling evidence that an increase in lawful riding opportunities would be likely to significantly increase the level of unlawful activity and that the unlawful activity would take place in a significant amount of environmentally sensitive areas.
> 18) The Board found that the SEPA Responsible Official decision to issue a final determination of non-significance was proper and not "clearly erroneous" and that the appellant's [sic] failed to produce compelling evidence to the contrary.

CP at 411. The Board of County Commissioners concluded:

> [T]he SEPA process had been properly conducted and had provided a reasonably thorough discussion of any probable, significant, adverse impacts caused by the proposal. The Board determined the appellants had failed to provide evidence that:
> A) Overcome the deference accorded to the decision of the responsible official

B) Prove that the decisions made by the SEPA Responsible Official were clearly erroneous or that any mistakes, if made, were egregious in terms of affecting the opportunities afforded the public to participate in the process or in the decision makers access to complete information.

C) Prove the SEPA process failed to meet the "reasonably thorough" standard required by law

CP at 412.

On June 23, 2014, the Okanogan County Board of County Commissioners adopted its ATV ordinance, Ordinance 2014-7. The ordinance reads, in part:

An ordinance designating certain roads in Okanogan County open to

use by wheeled All-Terrain Vehicles.

WHEREAS: Engrossed Substitute House Bill 1632 states the legislature finds that off-road vehicle users have been overwhelmed with varied confusing rules, regulations, and ordinances from federal, state, county, and city land managers throughout the state to the extent standardization statewide is needed to maintain public safety and good order, and

WHEREAS: Engrossed Substitute House Bill 1632 states it is the intent of the legislature to: (a) Increase opportunities for safe, legal, and environmentally acceptable motorized recreation; (b) decrease the amount of unlawful or environmentally harmful motorized recreation; (c) generate funds for use in maintenance, signage, education, and enforcement of motorized recreation opportunities; (d) advance a culture of self-policing and abuse intolerance among motorized recreationists; (e) cause no change in the policies of any governmental agency with respect to public land; (f) not change any current ORV usage routes as authorized in chapter 213, Laws of 2005; (g) stimulate rural economies by opening certain roadways to use by motorized recreationists which will in turn stimulate economic activity through expenditures on gasoline, lodging, food and drink, and other entertainment purposes; (h) and require all wheeled all-terrain vehicles to obtain a metal tag, and

WHEREAS: Consistent with Revised Code of Washington 46.09.455(c)(i) A person may not operate a wheeled all-terrain vehicle on a

34

public roadway within the boundaries of a county, not including non-highway roads and trails, with a population of fifteen thousand or more unless the county by ordinance has approved the operation of wheeled all-terrain vehicles on county roadways, not including non-highway roads and trails, and

WHEREAS: Okanogan County Code 10.10 authorizes the operation of off-road vehicles on county roads designated for that purpose; and

WHEREAS: Okanogan County has conducted a public review on a proposal to open certain county roads with a posted speed limit of 35 miles-per-hour or less that are not already designated for off road vehicle use, and

WHEREAS: The SEPA Responsible Official for Okanogan County prepared an environmental checklist and conducted a SEPA review on the proposal consistent with the requirements of RCW 43.21c, WAC 197-11, and OCC 14.04 and after review of the comments received issued a final determination of non-significance which was published in the official county newspaper on May 14, 2014, and

. . . .

WHEREAS: The Okanogan Board of County Commissioners considered the materials presented and testimony received and determined it was in the public's interest to designated certain county roads open to use by wheeled all-terrain vehicles, be it therefore

ORDAINED: The following listed county roads are open to use by wheeled all-terrain vehicles:

CP at 424-25 (boldface omitted). The ordinance appended a list of roads with mile posts between which one could drive an ATV.

PROCEDURE

After being denied relief by the Okanogan County Board of County Commissioners, CNW and MVCC again sued Okanogan County in superior court. The two groups invoked the trial court's jurisdiction under RCW 2.08.010 (superior court original jurisdiction), chapter 7.24 RCW (uniform declaratory relief act), chapter 7.40 RCW (injunctive relief), and RCW 43.21C.075 (judicial review under SEPA). The two

entities sought a declaratory judgment that Ordinance 2014-7 violated SEPA and the legislative intent of ESHB 1632. They asked for the voidance of the ATV ordinance and an injunction precluding the effectiveness of the ordinance. Okanogan County asserted five affirmative defenses: (1) CNW and MVCC suffered no injury and thus lacked standing under SEPA to challenge the ordinance, (2) the trial court could review Ordinance 2014-7 only under the Land Use Petition Act (LUPA), chapter 36.70C RCW, a cause of action not pled, (3) because LUPA afforded an adequate remedy, the two organizations could not obtain declaratory or injunctive relief, (4) the plaintiffs failed to file a petition for review within twenty-one days of the county's adoption of Ordinance 2014-7, as required by LUPA, and thus the trial court lacked jurisdiction to entertain the suit, and (5) any review by the superior court must be of the record from the Okanogan County Board of County Commissioners' review of the appeal to the Board.

Okanogan County moved to dismiss CNW's and MVCC's complaint or for the grant of summary judgment in its favor. The two groups cross-moved for summary judgment. The superior court granted the county's motion to dismiss and denied the organizations' motion for summary judgment. The trial court concluded that Okanogan County did not violate SEPA and CNW and MVCC failed to establish a justiciable controversy sufficient for it to consider whether Ordinance 2014-7 violates ESHB 1632. On appeal, Okanogan County contends that the trial court ruled that the environmental

groups or their members lacked any injury. The trial court did not address standing or subject matter jurisdiction.

## LAW AND ANALYSIS

CNW and MVCC appeal the trial court's grant of summary judgment to Okanogan County and its dismissal of their claims with prejudice. As it did below, Okanogan County on appeal contends that the environmental groups lack standing to challenge Ordinance 2014-7 and that the trial court lacked subject matter jurisdiction to hear the action for declaratory judgment and injunctive relief.

### Superior Court Jurisdiction

When a defendant raises standing as a defense, the reviewing court usually addresses this defense first. We instead first address the question of whether the trial court possessed subject matter jurisdiction to hear CNW's and MVCC's challenge. The determination of standing may depend on the cause of action or form of action amenable to this suit and actually asserted in the case. If the trial court lacked jurisdiction, standing becomes moot, and we must reject the appeal.

Subject matter jurisdiction is the authority to hear and determine the class of action to which a case belongs. *Bour v. Johnson*, 80 Wn. App. 643, 647, 910 P.2d 548 (1996). This court reviews jurisdictional issues de novo. *Knight v. City of Yelm*, 173 Wn.2d 325, 336, 267 P.3d 973 (2011).

*LUPA*

Okanogan County contends the challenge to the county's environmental checklist and Ordinance 2014-7 falls within the parameters of either chapter 7.16 RCW, which addresses a statutory writ of review, or the Land Use Petition Act. Okanogan County argues that, because one of the alternative procedures provided CNW an adequate remedy, CNW could not assert the superior court's general jurisdiction, seek declaratory relief, or seek relief under the injunction statutes. When asserting this argument, Okanogan County forgets that CNW and MVCC also advanced an appeal under SEPA statutes. We disagree that either LUPA or the writ of review procedure applies. We address LUPA first.

LUPA pertains to judicial review of all land use decisions with some exceptions noted in the statute. RCW 36.70C.010-030; *Chelan County v. Nykreim*, 146 Wn.2d 904, 916, 52 P.3d 1 (2002). In enacting LUPA in 1995, the legislature determined that LUPA "'shall be the *exclusive* means of judicial review of land use decisions,'" with certain specific exceptions. *Chelan County v. Nykreim*, 146 Wn.2d at 917 (quoting RCW 36.70C.030(1)). A land use petition is barred, and the court may not grant review, unless the petition is timely filed with the court within twenty-one days of the issuance of the land use decision. RCW 36.70C.040(3).

We must decide if Ordinance 2014-7 or the Okanogan County declaration of nonsignificance for the environmental impact of Ordinance 2014-7 constitutes a "land

use decision" within the meaning of LUPA. A "land use decision" is:

> a final determination by a local jurisdiction's body or officer with the highest level of authority to make the determination, including those with authority to hear appeals, on:
>
> (a) An *application* for a project permit or other governmental approval required by law before real property may be improved, developed, modified, sold, transferred, or used . . .
>
> (b) An *interpretative or declaratory decision* regarding the application to a specific property of zoning or other ordinances or rules regulating the improvement, development, modification, maintenance, or use of real property; and
>
> (c) The *enforcement by a local jurisdiction of ordinances* regulating the improvement, development, modification, maintenance, or use of real property. . . .

RCW 36.70C.020(2) (emphasis added).

Ordinance 2014-7 and the environmental checklist and DNS preceding the ordinance concerned ATV use of county roads. No one applied for a project permit or governmental approval of use of his or her property. CNW challenges the adoption of an ordinance, not the enforcement of an ordinance concerning someone's use of property. The Board of County Commissioners, on enacting Ordinance 2014-7, did not issue an interpretative or declaratory decision. "Land use decisions" are applications, interpretive or declaratory decisions, and enforcement of certain ordinances. *See Chelan County v. Nykreim*, 146 Wn.2d at 927 (2002); *Samuel's Furniture, Inc. v. Dep't of Ecology*, 147 Wn.2d 440, 451, 54 P.3d 1194, 63 P.3d 764 (2002); *Brotherton v. Jefferson County*, 160 Wn. App. 699, 704, 249 P.3d 666 (2011). CNW and MVCC need not have filed suit under LUPA.

39

*Writ of Review*

RCW 7.16.040 provides:

> A writ of review shall be granted by any court, except a municipal or district court, *when an inferior tribunal, board or officer, exercising judicial functions*, has exceeded the jurisdiction of such tribunal, board or officer, *or one acting illegally, or to correct any erroneous or void proceeding,* or a proceeding not according to the course of the common law, and *there is no appeal, nor in the judgment of the court, any plain, speedy and adequate remedy at law.*

(Emphasis added.) Statutory writs of review are available for judicial or quasi-judicial actions. *Harris v. Pierce County*, 84 Wn. App. 222, 228, 928 P.2d 1111 (1996). They are not available, however, for legislative actions. *Raynes v. City of Leavenworth*, 118 Wn.2d 237, 244 n.2, 821 P.2d 1204 (1992); *Leavitt v. Jefferson County*, 74 Wn. App. 668, 677, 875 P.2d 681 (1994). We need not address whether the adoption of Ordinance 2014-7 or the denial of CNW's appeal of the county SEPA official by the Okanogan County Board of County Commissioners constituted a legislative or judicial action. We resolve the issue on another ground.

Okanogan County contends that CNW and MVCC must have sought a writ of review if available, rather than seeking superior court jurisdiction on another basis. Nevertheless, the opposite is true. RCW 7.16.040 denies an applicant the writ if the applicant has another remedy. Because SEPA affords a method of appeal, a statutory writ of review under chapter 7.16 RCW is not available. *Raynes v. City of Leavenworth*, 118 Wn.2d at 244; *Foster v. King County*, 83 Wn. App. 339, 346, 921 P.2d 552 (1996).

In *Foster v. King County*, the court specifically denied the applicant a writ of review in a SEPA appeal.

## *SEPA Appeal*

Since LUPA does not encompass CNW's and MVCC's challenge and because the statutory writ of review does not interfere with this challenge to Okanogan County actions, we now ask whether any of the four legal paths, on which the organizations sought superior court jurisdiction, sufficed to bestow subject matter jurisdiction. CNW and MVCC solicited superior court jurisdiction under four statutes: (1) the superior court's broad original jurisdiction afforded under RCW 2.08.010, (2) jurisdiction granted under the declaratory relief act, chapter 7.24 RCW, (3) power bequeathed to issue injunctions under chapter 7.40 RCW, and (4) the right to judicial review to determine compliance with SEPA under RCW 43.21C.075. CNW needs to show jurisdiction under only one of the four statutory schemes to receive the relief desired. We address SEPA jurisdiction and only SEPA jurisdiction.

SEPA authorizes judicial review of an agency's compliance with its terms. RCW 43.21C.075; *Lands Council v. Wash. State Parks & Recreation Comm'n*, 176 Wn. App. 787, 802, 309 P.3d 734 (2013). Therefore, RCW 43.21C.075 necessarily confers jurisdiction on the superior court.

Okanogan County faults CNW and MVCC for seeking declaratory relief in its complaint. The county contends that, since the groups ask for declaratory relief, the

41

superior court and this court is limited to addressing legislative action, and the Board of County Commissioners' affirmation of the county SEPA official's preparation of the environmental checklist constituted a quasi-judicial, not a legislative, action. According to the county, a declaratory judgment action invokes the trial court's original jurisdiction, not appellate jurisdiction, and, since CNW and MVCC ask this court to declare the Board of County Commissioners' denial of its appeal to be clearly erroneous, they mistakenly invoked the superior court's appellate jurisdiction.

In order to convince this court to reject the appeal for lack of jurisdiction, Okanogan County devotes pages to analyzing and characterizing the Board of County Commissioners' challenged action as quasi-judicial in nature. We need not engage in a similar analysis because the answer to Okanogan County's challenge to subject matter jurisdiction lies elsewhere.

Okanogan County ignores the language in the complaint asserting jurisdiction under SEPA. CNW and MVCC may have characterized much of its lawsuit as being in the nature of a declaratory judgment action. They asked for a declaration that the Okanogan County action was clearly erroneous. They captioned its complaint as one for declaratory judgment and injunctive relief. Nevertheless, the organizations also specifically sought judicial review under SEPA. Okanogan County cites no authority that prevents the request for declaratory relief in the same suit when the plaintiff includes an appeal under SEPA. The county cites no authority that captioning a case as one for a

42

declaratory judgment renders null a request in the body of the complaint for SEPA review. In its essence, a SEPA appeal requests declaratory relief establishing that governmental action is contrary to law, so labeling the SEPA appeal in part as a declaratory judgment action creates no harm.

We note that, consistent with SEPA statutory provisions, CNW sought review of both Okanogan County Ordinance 2014-7 and the underlying environmental checklist and determination of nonsignificance by Okanogan County's SEPA official Perry Huston. SEPA demands that any "[j]udicial review . . . shall *without exception be of the governmental action* together with its accompanying environmental determinations." RCW 43.21C.075(6)(c). This so-called "linkage requirement" is meant to stave off judicial review until the underlying governmental action is final, thus preventing "orphan SEPA claims." *Boss v. Dep't of Transp.*, 113 Wn. App. 543, 549, 54 P.3d 207 (2002). SEPA compliance is "'evaluated as an integrated element of government decisionmaking,'" rather than an independent cause of action. *Foster v. King County*, 83 Wn. App. at 345 (1996) (quoting RICHARD L. SETTLE, THE WASHINGTON STATE ENVIRONMENTAL POLICY ACT: A LEGAL AND POLICY ANALYSIS § 20, at 244 (1995)).

## Standing

We now address whether CNW and MVCC possessed standing to challenge Okanogan County's actions under SEPA. The county contends that the organizations lack standing to seek judicial review of the county's SEPA determination of

43

nonsignificance. It contends that the organizations alleged no "injury in fact" to one or more of its members, but rather alleged only speculative future harm that Ordinance 2014-7 could potentially cause. The duo groups urge this court, under RAP 5.1(d), not to address the county's standing argument. In addition, CNW argues that it has organizational standing and that its members have been injured in fact.

CNW asks this court to ignore Okanogan County's challenge to standing because the county never cross appealed the issue. We decline this request. RAP 5.1(d) demands that a respondent seeking review of an issue file a notice of appeal timely under RAP 5.2(f). By raising the issue of standing, Okanogan County seeks no affirmative relief. A prevailing party is not required to cross appeal if it seeks no affirmative relief and may argue any grounds, supported by the record, to advocate affirming a trial court's decision. *McGowan v. State*, 148 Wn.2d 278, 287-88, 60 P.3d 67 (2002); RAP 5.1(d). A respondent may raise the sufficiency of a factual basis to support standing for the first time on appeal. RAP 2.5(a)(2); *Mitchell v. Doe*, 41 Wn. App. 846, 848, 706 P.2d 1100 (1985).

We move to the merits of Okanogan County's standing defense. The concept of standing asks: who, if anyone, does the law wish to litigate specific claims and issues. Courts resolve standing by reviewing the purposes behind the law asserted by the plaintiff, measuring the plaintiff's connection to those purposes, and gauging injury to the plaintiff.

44

SEPA grants an aggrieved person the right to judicial review of an agency's compliance with the statute. RCW 43.21C.075; *Lands Council v. Wash. State Parks & Recreation Comm'n*, 176 Wn. App. at 799 (2013). The term "person aggrieved" was intended to include anyone with standing to sue under existing law. *Trepanier v. City of Everett*, 64 Wn. App. 380, 382, 824 P.2d 524 (1992) (citing RICHARD L. SETTLE, THE WASHINGTON STATE ENVIRONMENTAL POLICY ACT § 20(b) at 248 (1987)).

In order to obtain review under SEPA statutes, the petitioner must establish standing. *Save a Valuable Env't (SAVE) v. City of Bothell*, 89 Wn.2d 862, 866, 576 P.2d 401 (1978); *Harris v. Pierce County*, 84 Wn. App. at 232 (1996). The party must allege: (1) his or her endangered interest falls within the zone of interests protected by SEPA, and (2) the party has suffered an injury in fact. *Kucera v. Dep't of Transp.*, 140 Wn.2d 200, 212, 995 P.2d 63 (2000); *Leavitt v. Jefferson County*, 74 Wn. App. at 678-79 (1994).

The standing of a nonprofit corporation to challenge governmental actions threatening environmental damage is firmly established in federal jurisprudence and Washington has adopted the federal approach. *SAVE v. City of Bothell*, 89 Wn.2d at 867; *Magnolia Neigh. Planning Council v. City of Seattle*, 155 Wn. App. 305, 312, 230 P.3d 190 (2010). A nonprofit organization may represent its members in a proceeding for judicial review so long as it shows that one or more of its members are specifically injured by a governmental action. *SAVE v. City of Bothell*, 89 Wn.2d at 867. Organizations have standing to assert the interests of their members, so long as the

members would otherwise have standing to sue, the purpose of the organization is germane to the issue, and neither the claim nor the relief requires the participation of individual members. *Five Corners Family Farmers v. State*, 173 Wn.2d 296, 304, 268 P.3d 892 (2011); *Int'l Ass'n of Firefighters, Local 1789 v. Spokane Airports*, 146 Wn.2d 207, 213-14, 45 P.3d 186, 50 P.3d 618 (2002).

The purposes of SEPA are:

> (1) To declare a state policy which will encourage productive and enjoyable harmony between humankind and the environment; (2) to promote efforts which will prevent or eliminate damage to the environment and biosphere; (3) and [to] stimulate the health and welfare of human beings; and (4) to enrich the understanding of the ecological systems and natural resources important to the state and nation.

RCW 43.21C.010. Thus, SEPA's "zone of interests" contemplates broad questions of environmental impact, identification of unavoidable adverse environmental effects, choices between long and short term environmental uses, and identification of the commitment of environmental resources. *Snohomish County Prop. Rights All. v. Snohomish County*, 76 Wn. App. 44, 52-53, 882 P.2d 807 (1994). The county concedes that CNW's and MVCC's interests in protecting the environment fall within SEPA's zone of interests. We agree.

We also hold that CNW and MVCC allege sufficient injury in fact to establish organizational standing to seek judicial review of the county's SEPA determination. A party meets the "injury in fact" prong of standing by showing that the injury will be

immediate, concrete, and specific, even though the allegations may be speculative and undocumented. *Kucera v. Dep't of Transp.*, 140 Wn.2d at 213 (2000); *Leavitt v. Jefferson County*, 74 Wn. App. at 679 (1994).

In *Lands Council v. Washington State Parks & Recreation Commission*, 176 Wn. App. 787 (2013), this court held that the petitioner held standing to challenge the Washington State Parks and Recreational Commission's decision to classify ski resort property as recreation land, thus allowing for alpine ski area expansion, despite the absence of a planned precise location for the ski runs. The State argued that the Lands Council could not show any immediate, concrete and specific injury because the commission had yet to map the ski runs. The Lands Council alleged that the ski area expansion would jeopardize wildlife and its habitat. The decision mentions little about the nature or members of Lands Council other than it was an environmental group.

We find federal law concerning the National Environmental Protection Act (NEPA) supports our conclusion that CNW has standing. Because NEPA is substantially similar to SEPA, we may look to federal case law for SEPA interpretation. *Int'l Longshore & Warehouse Union, Local 19 v. City of Seattle*, 176 Wn. App. 512, 525, 309 P.3d 654 (2013); *Pub. Util. Dist. No. 1 of Clark County v. Pollution Control Hr'gs Bd.*, 137 Wn. App. 150, 158, 151 P.3d 1067 (2007). Although standing does not strictly involve the interpretation of a statute, the NEPA and SEPA policies coincide such that standing rules under both statutory schemes should be similar. Our courts have followed

organization standing rules established in federal environmental jurisprudence. *SAVE v. City of Bothell*, 89 Wn.2d at 867; *Magnolia Neigh. Planning Council v. City of Seattle*, 155 Wn. App. at 312 (2010).

Under federal law, an environmental plaintiff adequately alleges injury in fact when she avers that she uses the affected area and is an individual for whom the aesthetic and recreational values of the area will be lessened by the challenged activity. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 183, 120 S. Ct. 693, 145 L. Ed. 2d 610 (2000); *Sierra Club v. Morton*, 405 U.S. 727, 735, 92 S. Ct. 1361, 31 L. Ed. 2d 636 (1972). Melanie Rowland and George Wooten, members of one or both of the plaintiff organizations, attested to hiking, photography, bird and wildlife watching, and studying native plants and trees in the Okanogan County wilderness.

In *Sierra Club v. U.S. Army Corps of Engineers*, 645 F.3d 978 (8th Cir. 2011), an environmental organization and a hunting club filed suits against the Army Corps of Engineers, the Fish and Wildlife Service, and an electric utility, seeking injunctive relief because of the federal agencies' grant of a permit to construct a new coal-fired power plant. The plaintiffs claimed violations of NEPA, among other environmental statutes. The reviewing court agreed that the environmental organization showed adequate injury in fact. One club member testified that he lived in the area and enjoyed taking pictures, hunting, and studying its history and archaeology. The member was disturbed by the mud and siltation from the plant site, the increase in dust caused by traffic on the

48

highway, as well as noise and light pollution coming from the plant. Another member was an avid bird watcher and nature photographer in the area. He expressed his concern that power plant construction would affect one of the most beautiful areas he has visited.

Closer to home, in *National Wildlife Federation v. Espy*, 45 F.3d 1337 (9th Cir. 1995), environmental groups brought action under NEPA against the United States Secretary of Agriculture and purchasers of property, alleging that the transfer of property without creating easements to protect wetlands violated NEPA. The reviewing court held that the complaint sufficiently alleged each element of standing. The allegations that several of plaintiffs' members enjoy the aesthetic value of the wetlands and the opportunities they afforded for hiking, hunting, and bird-watching, asserted a legally protected interest sufficient for standing.

In challenging CNW's standing, Okanogan County argues that CNW and MVCC present no specific studies with regard to harm in Okanogan County, no evidence of how, when or where there will be harm to any area by reason of the ATV ordinance, and no evidence that any organization member has any interest beyond that of the general public in land adjacent to opened roads. Nevertheless, Okanogan County cites no decision that requires a study supporting damage to an environment in order that an environmental group may gain standing. CNW and MVCC nonetheless presents numerous studies of damage to wildlife in various regions by ATVs. The county cites no requirement that an environmental group must identify a precise location and time for the potential harm.

The organizations anyway forwards direct and specific evidence of damage to the Okanogan County environment in precise locations as a result of ATVs. Cases support the proposition that a desire to see and value the environment sets an organization or its members apart from the general public for purposes of standing under environmental laws.

Finally, Okanogan County maintains that, while CNW and MVCC may show damage to the environment by ATV use, the two groups cannot show damage caused by opening additional roads to ATV use. We find no case that requires such precision of proof as to damage in order to gain standing. Proponents of the ATV ordinance contend that the ordinance will attract ATV users to Okanogan County, thereby increasing the use of Okanogan County roads. Logically, the additional ATV riders will probably lead to some off-road riding and some environmental damage. CNW and MVCC members have documented present and ongoing instances of illegal ATV off-roading that increased with the opening of an additional 597 miles of county road to ATV traffic. CNW alleges that its members will lose recreational space, aesthetic enjoyment, and sensitive wildlife areas as a result of increased ATV traffic.

In arguing that CNW and MVCC lacks standing, the county relies on *Harris v. Pierce County*, 84 Wn. App. 222 (1996). In that case, a citizens group challenged the adequacy of Pierce County's final environmental impact statement for the creation of a system of multi-purpose trails. The group brought a writ of certiorari and attached

declarations from members stating that their property could be condemned by the county for the new trail system. We held that the group failed to establish standing because economic interests do not fall within the zone of interests protected by SEPA and the concern that property might be condemned did not establish an immediate, concrete and specific injury.

*Harris* does not raise the relatively low bar for environmental standing. CNW and MVCC do not rely on economic harm to its members. CNW's interest in protecting the environment adjacent to roads newly opened to ATVs in Okanogan County falls within SEPA's zone of interests.

CNW and MVCC also argue that this court could analyze standing under a relaxed procedural analysis advocated in *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 572 n.7, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992) and *Five Corners Family Farmers v. State*, 173 Wn.2d at 303 (2011) and applied in *Lands Council v. Washington State Parks & Recreation Commission*, 176 Wn. App. 787 (2013). Because we find standing under traditional principles of standing, we need not address this alternate grounds for standing.

## ESHB 1632

Both sides promote the 2013 law, ESHB 1632, as supporting their respective legal positions. Okanogan County does not expressly argue that the 2013 bill rid the county of the need to prepare an environmental checklist. Nevertheless, the county argues that ESHB 1632 established a legislative policy that declares that either ATVs do not harm

the environment or the economic benefits of ATV riding prevails over any environmental harm. We discern no such legislative pronouncements.

In enacting ESHB 1632, the legislature found:

> that off-road vehicle users have been overwhelmed with varied confusing rules, regulations, and ordinances from federal, state, county, and city land managers throughout the state to the extent standardization statewide is needed to maintain public safety and good order.

LAWS OF 2013, 2d Spec. Sess., ch. 23, § 1(1). Through ESHB 1632, the Washington legislature sought to:

> (a) Increase opportunities for safe, legal, and environmentally acceptable motorized recreation; (b) decrease the amount of unlawful or environmentally harmful motorized recreation; (c) generate funds for use in maintenance, signage, education, and enforcement of motorized recreation opportunities; (d) advance a culture of self-policing and abuse intolerance among motorized recreationists; (e) cause no change in the policies of any governmental agency with respect to public land; (f) not change any current ORV usage routes as authorized in chapter 213, Laws of 2005; (g) stimulate rural economies by opening certain roadways to use by motorized recreationists which will in turn stimulate economic activity through expenditures on gasoline, lodging, food and drink, and other entertainment purposes; and (h) require all wheeled all-terrain vehicles to obtain a metal tag.

LAWS OF 2013, 2d Spec. Sess., ch. 23, § 1(2).

Section 6 of ESHB 1632 opened state highways, with a speed limit of thirty-five miles per hour or less, to the operation of wheeled all-terrain vehicles (WATVs). LAWS OF 2013, 2d Spec. Sess., ch. 23, § 6, *codified at* RCW 46.09.455(1). Section 6 of the enactment also granted counties with a population of fifteen thousand or more the

authority to open county public roadways for WATV use. *Codified at* RCW 46.09.455(1)(c)(i). Portions of the bill are codified at RCW 46.09.455.

The preface to ESHB 1632 laments that off-road vehicle users have been overwhelmed with varied confusing regulations and ordinances from federal, state, county, and city governments. Okanogan County does not suggest that preparation of a thorough environmental checklist, before a county adopts an ordinance extending the miles of roads for ATV use, instigates confusing regulations or ordinances. The checklist does not create any new ordinances or regulations.

Through ESHB 1632, the Washington Legislature sought to stimulate rural economies by opening "certain roadways" to use by motorized recreationists. LAWS OF 2013, 2d Spec. Sess., ch. 23, § 1. Reference to "certain roadways" suggests the legislature was not anticipating a rural county to open all roadways to ATV use, let alone all roadways with a speed limit under 35 m.p.h. Also, the legislature's desire to stimulate local economies does not equate to a legislative wish to void environmental protections and free a local government from complying with SEPA. To the contrary, the legislature included in the law the desiderata of increasing "legal and, *environmentally acceptable* motorized recreation" and conversely decreasing "the amount of unlawful or *environmentally harmful* motorized recreation." LAWS OF 2013, 2d Spec. Sess., ch. 23, § 1(2)(a), (b) (emphasis added). Thus, failing to address the environmental impact of opening certain roadways runs contrary to the bill's stated purpose.

53

CNW and MVCC do not seek to preclude the opening of all county roads to ATV traffic. Instead, the organizations advocate a selective opening of roads. A county may follow both RCW 46.09.455 and SEPA by opening more roads to ATV traffic after thoroughly considering the environmental impacts of the action. Statutes are to be read together, whenever possible, to achieve a harmonious total statutory scheme, which maintains the integrity of the respective statutes. *In re Bankr. of Wieber*, 182 Wn.2d 919, 926, 347 P.3d 41 (2015).

Okanogan County for good reason does not contend that ESHB 1632 partially repealed SEPA. We do not favor repeal by implication, and, when potentially conflicting acts can be harmonized, we construe each to maintain the integrity of the other. *City of Spokane v. Rothwell*, 166 Wn.2d 872, 877, 215 P.3d 162 (2009); *Anderson v. Dep't of Corr.*, 159 Wn.2d 849, 858-59, 154 P.3d 220 (2007). Implied repeal is disfavored and will be found only (1) when the later act covers the entire field of the earlier one, is complete in itself, and is intended to supersede prior legislation, or (2) when the two acts cannot be reconciled and both given effect by a fair and reasonable construction. *State v. Conte*, 159 Wn.2d 797, 815, 154 P.3d 194 (2007); *Amalgamated Transit Union Legis. Council v. State*, 145 Wn.2d 544, 552, 40 P.3d 656 (2002). ESHB 1632 did not cover environmental policy. The legislature expressed no intent in the bill to supersede SEPA. SEPA and ESHB 1632 can be reconciled.

In short, RCW 46.09.455(1)(c)(i) authorizes a county to open roadways to ATVs.

The statute does not authorize a county to avoid the provisions of SEPA. Therefore, we move to the heart of the dispute between the parties: whether the environmental checklist prepared by Okanogan County SEPA official Perry Huston satisfied requirements imposed by SEPA.

### Environmental Checklist

The Washington State Legislature adopted the State Environment Policy Act in 1971 as a means to create a process to identify possible environmental impacts that may accompany governmental actions. These actions include issuing permits for private projects, constructing public facilities, or adopting ordinances, regulations, policies, or plans. Information provided during the SEPA review process enables agencies, applicants, and the public to assess how a proposed action will affect the environment. The assembled information may lead to a change in a proposal to reduce impacts or to condition or deny a proposal because of adverse environmental impacts.

SEPA recognizes the broad policy "that each person has a fundamental and inalienable right to a healthful environment." RCW 43.21C.020(3). State agencies are required to use "all practicable means" to achieve the following goals:

> (a) Fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;
> (b) Assure for all people of Washington safe, healthful, productive, and aesthetically and culturally pleasing surroundings;
> (c) Attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences.

RCW 43.21C.020(2). Over forty years ago, with the adoption of SEPA, we first read in Washington law that each generation is a trustee of the environment for succeeding generations. *Lands Council v. Wash. State Parks & Recreation Comm'n*, 176 Wn. App. at 807-08 (2013).

Contrary to popular belief, SEPA does not demand a particular substantive result in government decision making. Instead, the act ensures that environmental values are given appropriate consideration. *Stempel v. Dep't of Water Res.*, 82 Wn.2d 109, 118, 508 P.2d 166 (1973); *Moss v. City of Bellingham*, 109 Wn. App. 6, 14, 31 P.3d 703 (2001). SEPA imposes on the government agency a duty to assemble and review full environmental information before rendering a decision. *Davidson Serles & Assocs. v. City of Kirkland*, 159 Wn. App. 616, 634-35, 246 P.3d 822 (2011). Briefly stated, the procedural provisions of SEPA constitute an environmental full disclosure law. *Norway Hill Pres. & Prot. Ass'n v. King County Council*, 87 Wn.2d 267, 272, 552 P.2d 674 (1976). SEPA attempts to shape the state's future environment by deliberation, not default. *Stempel v. Dep't of Water Res.*, 82 Wn.2d at 118; *Loveless v. Yantis*, 82 Wn.2d 754, 765-66, 513 P.2d 1023 (1973). In essence, SEPA requires that the "presently unquantified environmental amenities and values will be given appropriate consideration in decision making along with economic and technical considerations." RCW 43.21C.030(2)(b); *see also Norway Hill*, 87 Wn.2d at 272 (1976).

56

RCW 43.21C.030(2)(c), a critical section of SEPA, requires all counties to:

> Include in every recommendation or report on proposals for legislation and other major actions significantly affecting the quality of the environment, a detailed statement by the responsible official on:
> (i) the environmental impact of the proposed action;
> (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented;
> (iii) alternatives to the proposed action;
> (iv) the relationship between local short-term uses of the environment and the maintenance and enhancement of long-term productivity; and
> (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Thus, under RCW 43.21C.030(2)(c), major actions significantly affecting the quality of

the environment require an environmental impact statement. *Cheney v. Mountlake*

*Terrace*, 87 Wn.2d 338, 344, 552 P.2d 184 (1976); *Davidson Serles & Assocs. v. City of*

*Kirkland*, 159 Wn. App. at 634 (2011).

An administrative rule implementing SEPA defines "major action" circularly:

> "Major action" means an action that is likely to have significant adverse environmental impacts. "Major" reinforces but does not have a meaning independent of "significantly" (WAC 197-11-794).

WAC 197-11-764. WAC 197-11-704, in turn, defines "actions" as:

> (1) "Actions" include, *as further specified below:*
>  . . . .
> *(c) Legislative proposals.*
> (2) Actions fall within one of two categories:
> (a) Project actions. . . .
> (b) Nonproject actions. Nonproject actions involve decisions on policies, plans, or programs.

(i) The adoption or amendment of legislation, *ordinances*, rules, or regulations that contain standards controlling use or modification of the environment;

. . . .

(Emphasis added) (Boldface omitted). Okanogan County agrees that its adoption of

Ordinance 2014-7 constitutes an action within the meaning of SEPA. The county,

however, contends the ordinance does not significantly impact the environment.

If SEPA covers a local governmental action, the government next determines if

the action will "significantly affect" the environment. SEPA does not define

"significantly affecting." *Davidson Serles v. City of Kirkland*, 159 Wn. App. at 634.

WAC 197-11-794 reads:

(1) "Significant" as used in SEPA means a reasonable likelihood of more than a moderate adverse impact on environmental quality.
(2) Significance involves context and intensity (WAC 197-11-330) and does not lend itself to a formula or quantifiable test. The context may vary with the physical setting. Intensity depends on the magnitude and duration of an impact.
The severity of an impact should be weighed along with the likelihood of its occurrence. An impact may be significant if its chance of occurrence is not great, but the resulting environmental impact would be severe if it occurred.

Under case law, the agency should prepare the environmental impact statement

whenever more than a moderate effect on the quality of the environment resulting from

the governmental action is a reasonable probability. *King County v. Wash. State*

*Boundary Review Bd. for King County*, 122 Wn.2d 648, 664, 860 P.2d 1024 (1993).

Under SEPA, evaluation of a proposal's environmental impacts requires examination of

at least two relevant factors: (1) the extent to which the action will cause adverse environmental effects in excess of those created by existing uses in the area, and (2) the absolute quantitative adverse environmental effects of the action itself, including the cumulative harm that results from its contribution to existing adverse conditions or uses in the affected area. *Norway Hill*, 87 Wn.2d at 277 (1976); *Narrowsview Pres. Ass'n v. City of Tacoma*, 84 Wn.2d 416, 423, 526 P.2d 897 (1974).

The decision of whether a governmental action will significantly impact the environment is called the threshold determination. *Moss v. City of Bellingham*, 109 Wn. App. at 14 (2001). The lead agency must make its threshold determination based on information reasonably sufficient to evaluate the environmental impact of a proposal. WAC 197-11-335; *Moss v. City of Bellingham*, 109 Wn. App. at 14. The agency issues a determination of nonsignificance if it determines that the project will have no probable significant adverse environmental impacts. WAC 197-11-340(1); *Lanzce G. Douglass, Inc. v. City of Spokane Valley*, 154 Wn. App. 408, 422, 225 P.3d 448 (2010). If the local government decides that a proposal "may have a probable significant adverse environmental impact," the agency issues a determination of significance and identifies the areas on which an environmental impact statement must focus. RCW 43.21C.031; WAC 197-11-360(1); *Lanzce G. Douglass*, 154 Wn. App. at 422. A determination of significance mandates the preparation of a full environmental impact statement. *Moss v. City of Bellingham*, 109 Wn. App. at 15 (2001).

Before reaching the determination of significance or nonsignificance, the government agency reviews an environmental checklist. WAC 197-11-315; *Moss v. City of Bellingham*, 109 Wn. App. at 14 (2001). When the local governmental action constitutes the granting of a development permit, the applicant of the permit completes the environmental checklist. If the action entails an ordinance, the local government prepares and reviews the checklist. This appeal centers on the environmental checklist prepared by Okanogan County SEPA official Perry Huston.

By way of the environmental checklist, the responsible agency must show that it considered the relevant environmental factors and that its decision to issue any determination of nonsignificance was based on information sufficient to evaluate the proposal's environmental impact. RCW 43.21C.030(2)(c); *Wenatchee Sportsmen Ass'n v. Chelan County*, 141 Wn.2d 169, 176, 4 P.3d 123 (2000). The purpose of the checklist is to ensure an agency, at the earliest possible stage, fully discloses and carefully considers a proposal's environmental impact before adopting it. *Spokane County v. E. Wash. Growth Mgmt. Hr'gs Bd.*, 176 Wn. App. 555, 579, 309 P.3d 673 (2013), *review denied*, 179 Wn.2d 1015, 318 P.3d 279 (2014). If the checklist does not contain sufficient information to make a threshold determination, the preparer may be required to submit additional information. WAC 197-11-335(1); *Moss v. City of Bellingham*, 109 Wn. App. at 14 (2001). This latter rule controls this appeal.

60

CNW and MVCC contend that Okanogan County's DNS was clearly erroneous because the environmental checklist it prepared omits sufficient information to evaluate the probable environmental impacts on sensitive lands and waters, traffic congestion and safety, and public services and enforcement. CNW maintains that the county ignored concrete evidence that illegal ATV off-road riding causes significant environmental harm and is difficult to prevent because of the remoteness of the activity. CNW argues that the county's failure to consider the proven impact of ATV riding rendered meaningless the process of preparing a SEPA environmental checklist. CNW asks this court to declare Ordinance 2014-7 null and void because the inadequate environmental checklist led to a flawed declaration of nonsignificance and a mottled ordinance.

Okanogan County contends that, throughout the county's SEPA review process, CNW and MVCC provided only information on possible harm and never identified a specific road section where harm is inevitable. The county argues that we must afford substantial weight to the responsible officials in reviewing SEPA cases. Thus, it argues, the declaration of nonsignificance was not clearly erroneous and we must uphold Ordinance 2014-7.

We review the decision of the Okanogan County Board of County Commissioners under the "clearly erroneous" standard. This standard provides a broader or less deferential review than the "arbitrary or capricious" standard because it mandates a review of the entire record and all the evidence rather than just a search for substantial

61

evidence to support an administrative finding or decision. *Norway Hill*, 87 Wn.2d at 274 (1976); *Ancheta v. Daly*, 77 Wn.2d 255, 259-60, 461 P.2d 531 (1969). A SEPA determination is clearly erroneous "'when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Norway Hill v. King County Council*, 87 Wn.2d at 274 (internal quotation marks omitted) (quoting *Ancheta*, 77 Wn.2d at 259). Judicial review under the "clearly erroneous" standard also requires consideration of the "'public policy contained in the act of the legislature authorizing the decision.'" *Norway Hill*, 87 Wn.2d at 274 (quoting former RCW 34.04.130(6)(e) (1967)). Consequently, that public policy is a part of the standard of review. *Norway Hill*, 87 Wn.2d at 275 (1976); *Schuffenhauer v. Dep't of Emp't Sec.*, 86 Wn.2d 233, 235, 543 P.2d 343 (1975).

We now address some of the principles forwarded by Okanogan County to sustain Ordinance 2014-7. We then mention broad principles violated by the county's environmental checklist and list specific defects we find in the checklist. We then end with a discussion of the arguments forwarded by Okanogan County to uphold the ordinance.

Okanogan County relies on the rule that, when a proposal changes neither the actual current uses to which the land was put nor the impact of continued use on the surrounding environment, that action is not a major action significantly affecting the environment and an environmental impact statement is not required. *Chuckanut*

*Conservancy v. Dep't of Nat. Res.*, 156 Wn. App. 274, 285, 232 P.3d 1154 (2010);

*ASARCO Inc. v. Air Quality Coal.*, 92 Wn.2d 685, 706, 601 P.2d 501 (1979). We

recognize the validity of this rule. We also recognize that the local government need not

identify and evaluate every remote and speculative environmental consequence of an

action. *Cheney v. Mountlake Terrace*, 87 Wn.2d at 344. Nevertheless, we consider other

rules more fitting to our decision. We also disagree with Okanogan County's contention

that the ATV ordinance merely continues the current use and current impact on the

environment of its roads.

Many principles support the position of CNW and MVCC. The government

decision makers must consider more than the narrow, limited environmental impact of

the immediate, pending action. *Cheney v. Mountlake Terrace*, 87 Wn.2d at 344; *Lanzce

G. Douglass, Inc. v. City of Spokane Valley*, 154 Wn. App. at 424 (2010). The agency

cannot close its eyes to the ultimate probable environmental consequences of its current

action. *Cheney v. Mountlake Terrace*, 87 Wn.2d at 344; *Eastlake Cmty Council v.

Roanoke Assoc., Inc.*, 82 Wn.2d 475, 492-93, 513 P.2d 36 (1973); *Loveless v. Yantis*, 82

Wn.2d at 765 (1973). To repeat, because NEPA is substantially similar to SEPA, we

may look to federal case law for SEPA interpretation. *Int'l Longshore & Warehouse

Union, Local 19 v. City of Seattle*, 176 Wn. App. at 525 (2013); *Pub. Util. Dist. No. 1 of

Clark County*, 137 Wn. App. at 158 (2007). Under federal law, simple, conclusory

statements of "no impact" fail to fulfill an agency's duty when preparing an initial

environmental assessment under NEPA. *Found. on Econ. Trends v. Weinberger*, 610 F. Supp. 829, 841 (D.D.C. 1985). An agency must take the requisite "hard look" at the environmental concern, and the initial assessment must indicate that the agency has taken a searching, realistic look at the potential hazards and, with reasoned thought and analysis, candidly and methodically addressed those concerns. *Found. on Econ. Trends v. Weinberger*, 610 F. Supp. at 841.

Our decision in *Spokane County v. Eastern Washington Growth Management Hearings Board*, 176 Wn. App. 555 (2013), echoes the federal law's mandate of detailed information in environmental checklists and the requirement of assessing potential environmental damage to areas surrounding the government project. The decision also joins federal law in condemning broad generalizations and rote answers in the checklist. In *Spokane County*, this court upheld a growth management hearings board decision to invalidate a resolution amending the Spokane County's comprehensive plan and zoning maps on the grounds that the resolution violated SEPA. The county prepared an inadequate environmental checklist, thus leading it to also issue an erroneous DNS. The checklist addressed various amendments with broad generalizations. The checklist did not tailor its scope or level of detail to address the probable impacts on environmental aspects such as water quality resulting from amendments. Instead, the checklist repeated formulaic language postponing environmental analysis to the project review stage and assuming compliance with applicable standards. The opinion does not share the

generalizations and formulaic language in the checklist. In short, the administrative record showed the county failed to fully disclose or carefully consider the environmental impact of amendments.

Okanogan County's environmental checklist contains repetitive, superficial, conclusory statements regarding the potential environmental impact of opening nearly 600 miles of county roads to ATV use. The checklist is almost devoid of specific information.

We conclude that, at a minimum, the Okanogan County environmental checklist should list topographic features, soils, fora and fauna and identify endangered species and environmentally sensitive areas adjacent to the roads. At a minimum, the checklist should also address the following concerns:

- Increased traffic as a result of the ATV ordinance;

- Off road use encouraged by the opening of the roads and the usage's environmental impacts, including harm to soils, slopes, water, animals, and plants;

- Reported instances of off road use and its damage to environment;

- Some segments of roads being open to ATV traffic but not connected to other roads under 35 m.p.h.;

- Noise and air pollution resulting from both legal and illegal traffic;

- Adequacy of facilities, law enforcement, and emergency services to handle ATV use;

- Impact on threatened and endangered species from both legal and illegal traffic; and

- The applicability of the concerns raised by CNW in the literature provided concerning the effects of ATVs on the environment.

We now address contentions asserted by Okanogan County that would negate the need to provide the information we deem necessary for an environmental checklist. Okanogan County argues that it need not consider traffic congestions or emergency services need for increased ATV use. We disagree. In *Lanzce G. Douglass, Inc. v. City of Spokane Valley*, 154 Wn. App. 408 (2010), this court reversed the city planning division's decision to permit a housing development without first requiring an environmental impact statement. In so ruling, we noted that the city failed to consider the difficulty in evacuating the development in the event of an emergency. A hearing examiner had concluded that the development will add a significant volume of traffic to the already inadequate community transportation system.

Despite Okanogan County's stated intent of opening up roads to ATV use in order to increase ATV-based tourism and recreation, the county insists that Ordinance 2014-7 will not result in a substantial increase in ATV traffic. This conclusion belies the county's stated goal of the ordinance.

Okanogan County insists that, when preparing an environmental checklist, it need not consider off-road riding of ATVs, since such riding is illegal. The county impliedly contends that it need not consider unlawful behavior when considering environmental

66

impacts. No law supports this argument. Instead, the county is to consider all environmental impacts, whether resulting from legal or illegal conduct of ATV riders.

In *Center for Biological Diversity v. Blank*, 933 F. Supp. 2d 125 (D.D.C. 2013), the court held that various government agencies complied with NEPA, but only after finding that the government, in its initial assessment akin to a checklist, considered the possible impact of illegal bluefin fishing on the ocean environment. The government considered scientific reports that addressed illegal fishing when issuing a regulation.

More on point is *Sierra Club v. Bosworth*, 352 F. Supp. 2d 909 (D. Minn. 2005). An environmental organization challenged the Forest Service's planned sale of Superior National Forest timber. Any sale would necessitate the construction of logging roads and the later closure of the roads. The organization argued, in part, that the new roads would encourage illegal ATV traffic in the forest. The court agreed that the government failed to sufficiently analyze possible unlawful conduct of ATV users. The court noted the lack of enforcement officers in the national forest and evidence of prior illegal use of forest roads. The court ruled that:

> the Forest Service has not provided sufficient analysis to support its conclusory statement that "new road building or re-opening closed ones" are "not expected to result in any cumulative adverse effects." The analysis of this factor favors the necessity of preparing an EIS.

*Sierra Club v. Bosworth*, 352 F. Supp. 2d at 924-25. In *Greater Yellowstone Coalition v. U.S. Forest Service*, 12 F. Supp. 3d 1268 (D. Idaho 2014), the court also ruled that,

before opening roads to ATV traffic, the Forest Service must evaluate the impact on the environment resulting from illegal ATV use.

The Okanogan County environmental checklist omits listing of plants and animals in the areas adjacent to the roads opened for ATV use. The county justifies this omission with the observation that ATVs will only ride on roads. This county argument fails because SEPA does not limit the review of environmental impact from governmental action to any precise boundaries or the narrow scope of the project. SEPA demands the listing and analyzing of all environmental impacts resulting from an ordinance. The county's argument again also fails to recognize the possibility of off-road riding of ATVs attended to the opening of the roads.

The federal court, in *Greater Yellowstone Coalition v. U.S. Forest Service*, ruled that the government must address the impact of ATV use beyond the road on which ATV use is permitted. To address that impact, the government must know and list the types of soil, animals, and plants that inhabit the area. In *Greater Yellowstone Coalition*, an environmental group challenged the government's assessment of the environmental impact resulting from the opening of roads to ATV traffic. The proposed motorized trail lay one-half mile from the Caribou Mountain Recommended Wilderness Area. The Coalition argued that the Forest Service failed to consider the effects of having an ATV trail close to a recommended wilderness area and that the failure amounted to an arbitrary and capricious decision that violated NEPA. The court agreed. The Forest Service's

68

initial environmental assessment claimed that the opening of the road would "not affect the quality or quantity of wilderness opportunity available now or into the future," and that none of the trail construction was within the area. 12 F. Supp. 3d at 1276. The Coalition contended that the Forest Service may not simply conclude there is no effect but rather must analyze in the assessment the possible effects of the project on the wilderness area. The Coalition also argued that the Forest Service should have considered the noise impact of the ATVs and possible off-trail use of ATVs. The court noted the government's failure to address the noise impact on a wilderness area intended for solitude and primitive recreational use. In short, the government failed to take a "hard look" at the environmental consequences of opening a road to ATV traffic. *Greater Yellowstone Coalition*, 12 F. Supp. 3d at 1279.

Okanogan County forgets the nature of ATVs. An ATV is designed as an off-road recreational vehicle capable of cross-country travel on land, snow, ice, mud, swampland or other natural terrain. An ATV travels on multi-track, multi-wheel and low pressure tires for all terrains.

Okanogan County impliedly argues that the CNW and MVCC must show that environmental damage is inevitable at one or more specific locations. We read no such requirement into the SEPA process. We also note that the opponent of a governmental action holds no burden to show the possibility of environmental damage. Instead, SEPA

imposes the burden on the local government of thoroughly exploring and analyzing the possibility of environmental harm in an environmental checklist.

During the comment period, Okanogan County disregarded, as conjectural and speculative, numerous substantive statements and documentation from federal, state, tribal, and local government entities attesting to the ongoing negative impact of off-road ATV use on sensitive areas. Nevertheless, the county received overwhelming evidence of negative impacts, including evidence of actual off-road riding that damaged specified locations. Photographs confirmed the environmental harm.

We agree with Okanogan County that it need not consider, in the environmental checklist, the safety aspects of riding an ATV on pavement. Environmental policy laws direct the government to consider environmental impact, not public safety. *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 772, 103 S. Ct. 1556, 75 L. Ed. 2d 534 (1983). An increased risk of accidents is not an impact to the physical environment needed to be considered under NEPA. *Bicycle Trails Council of Marin v. Babbitt*, 82 F.3d 1445, 1466-67 (9th Cir. 1996).

In *Norway Hill Preservation and Protection Ass'n v. King County Council*, 87 Wn.2d at 275, the court ordered that an environmental impact statement be prepared because of the county's failure to comply with the SEPA process. We need not go this far. We do not order that Okanogan County prepare an environmental impact statement. Instead, since SEPA is an informational statute, we hold that Okanogan County, before

adopting an ATV ordinance, must prepare an environmental checklist that includes a complete disclosure and review of information relevant to the environmental impact to the areas surrounding roads opened by the ordinance.

A SEPA challenge addresses the legal adequacy of the environmental impact statement or environmental checklist and the actions taken in reliance of the environmental document, typically the enactment of an ordinance. RCW 43.21C.075(6)(c); *Davidson Serles & Assocs. v. City of Kirkland*, 159 Wn. App. at 632 n.8 (2011). Local agency authority to act is qualified by the requirements of SEPA, thus agency action that does not comply with SEPA is unlawful. *State v. Grays Harbor County*, 122 Wn.2d 244, 256 n.12, 857 P.2d 1039 (1993). We invalidate a county ordinance based on a violation of SEPA. *Barrie v. Kitsap County*, 93 Wn.2d 843, 861, 613 P.2d 1148 (1980); *Davidson Serles & Assocs. v. City of Kirkland*, 159 Wn. App. at 628 (2011). Since the environmental checklist preceding Okanogan County Ordinance 2014-7 is insufficient, the ordinance is void.

## Return to ESHB 1632

CNW last contends that Ordinance 2014-7 violates the intent of ESHB 1632. Because we void the ordinance on other grounds, we do not entertain this argument. CNW does not seek any relief, through its reliance on ESHB 1632, that we do not grant it by reason of declaring the environmental checklist insufficient.

71

No. 33194-6-III
*Conservation Nw. v. Okanogan County*

CONCLUSION

We reverse the trial court's grant of summary judgment in favor of Okanogan County and grant judgment in favor of CNW and MVCC on the ground that Ordinance 2014-7 violates SEPA. We thus invalidate Ordinance 2014-7. We vacate the award of fees and costs awarded by the superior court to Okanogan County against CNW and MVCC. Okanogan County is free to enact another ATV ordinance, but only after a sufficient environmental checklist. We grant CNW and MVCC fees and costs on appeal.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Fearing, C.J.

I CONCUR:

Siddoway, J.

72

APPENDIX A

Environmental checklist Prepared by Perry Huston

We place in bold print the responses of Huston:

1. Name of proposed project, if applicable:

**The proposal/project is an ordinance which opens approx. 597.23 miles of existing county roads to all - terrain- vehicle (ATV) use. The county currently manages a road system of 1266 miles. There are currently 335.73 miles of those roads open to ATV use.**

**(See attached maps)**

**The roads proposed to be opened to use by ATVs are listed on the attached spreadsheet.**
**(see attachment)**

. . . .

5. Agency requesting checklist: **Okanogan County Planning**

6. Proposed timing or schedule (including phasing, if applicable):

**It is anticipated notice of the proposal and threshold determination of non-significance will be published on April 16, 2014. A 14 day comment period for the SEPA determination will be conducted with review of the comments received immediately following. Subsequent determinations and the schedule for a public hearing on the proposal will be determined based on review of the comments received. If it is adopted the ordinance will be effective immediately.**

. . . .

8. List any environmental information you know about that has been prepared, or will be prepared, directly related to this proposal.

**There has been no other environmental information prepared relevant to this proposal. Any additional environmental information will be prepared if necessary to respond to issues identified during the comment period.**

. . . .

11. Give brief, complete description of your proposal, including the proposed uses and the size of the project and site. . . .

**The proposal/project is an ordinance which opens 597.23 miles of county roads to all-terrain-vehicle (ATV) use. The county currently manages a road system of 1266 miles. There are currently 335.73 miles of those roads open to ATV use.**

**(See attached maps)**

12. Location of the proposal. Give sufficient information for a person to understand the precise location of your proposed project, including a street address, if any, and section, township, and range, if known. If a proposal would occur over a range of area, provide the range or boundaries of the site(s). Provide a legal description, site plan, vicinity trap, and topographic map, if reasonably available. While you should submit any plans required by the agency, you are not required to duplicate maps or detailed plans submitted with any permit applications related to this checklist.

**The proposal will involve opening roads to ATV use throughout Okanogan County.**

B. ENVIRONMENTAL ELEMENTS

1. Earth

a. General description of the site (circle one): Flat, rolling, hilly, steep slopes, mountainous, other. . . .

**The proposal will involve already existing roadways throughout the county which cover a variety of topographical features. See attached map for roadways included in the proposal.**

. . . .

c. What general types of soils are found on the site (for example, clay, sand, gravel, peat, muck)? If you know the classification of agricultural soils, specify them and note any prime farmland.

**The proposal involves already existing roadways in Okanogan County. The roadways cover a variety of soil types already altered through road construction and paving or other surface treatments.**

d. .Are there surface indications or history of unstable soils in the immediate vicinity? If so, describe.

**The proposal involves already existing roadways throughout Okanogan County. There have been no areas identified as unsuitable for the existing roadway due to unstable soils.**

. . . .

f. Could erosion occur as a result of clearing, construction, or use? If so, generally describe.

**There is no construction necessary to implement this proposal. The proposal involves already existing roadways in Okanogan County. There is no erosion anticipated as a result of this proposal.**

g. About what percent of the site will be covered with impervious surfaces after project construction (for example, asphalt or buildings)?

**The proposal will open 597.33 miles of existing roadways to ATV use. 165.033 miles of these roads are currently paved. There will be no additional pavement installed or other road surfaces altered as a result of this proposal.**

h. Proposed measures to reduce or control erosion, or other impacts to the earth, if any:

**There are no measures proposed to reduce erosion or other impacts to the earth, other than normal roadway maintenance activities, as a result of this proposal.**

a. Air

a. What types of emissions to the air would result from the proposal (i.e., dust, automobile, odors, industrial wood smoke) during construction and when the project is completed? If any, generally describe and give approximate quantities if known.

**The proposal involves opening roadways in Okanogan County to ATV use that are already open to motor vehicle operation. The ATV's generate exhaust when in operation. The proposal does not involve increasing the number of ATV's in operation for any prescribed period of time and does not anticipate a significant increase in automobile odors. The roadways in the proposal have low speed limits in place to which the ATV's must adhere. There is no increase in dust anticipated as a result of this proposal.**

. . . .

c. Proposed measures to reduce or control emissions or other impacts to air, if any:

**There are no proposed measures to control emissions or other impacts.**

3. Water

a. Surface:

1) Is there any surface water body on or in the immediate vicinity of the site (including year-round and seasonal streams, saltwater, lakes, ponds, wetlands)? If yes, describe type and provide names. If appropriate, state what stream or river it flows into.

**The proposal involves existing county roadways. No new roadways will be constructed on or immediately adjacent to water bodies. See attached map for roadways included in the proposal.**

. . . .

5) Does the proposal lie within a 100-year floodplain? If so, note location on the site plan.

**The proposal involves existing county roads some of which lie within the 100 year flood plain. No new roadways will result from this proposal. See attached map for the location of the roads involved.**

6) Does the proposal involve any discharges of waste materials to surface waters? If so, describe the type of waste and anticipated volume of discharge.

**There will be no discharge of waste materials to surface waters as a result of this proposal.**

b. Ground:

1) Will ground water be withdrawn, or will water be discharged to ground water? Give general description; purpose, and approximate quantities if known.

**There will be no groundwater withdrawn as a result of this proposal.**

**There will be no water discharged to groundwater as a result of this proposal.**

. . . .

c. Water runoff (including stormwater):

1) Describe the source of runoff (including storm water) and method of collection and disposal, if any (include quantities, if known). Where will this water flow? Will this water flow into other waters? If so, describe.

**The proposal involves existing county roadways. There will be no increase in run -off or any alteration in the method of collection as a result of this proposal.**

2) Could waste materials enter ground or surface waters? If so, generally describe.

**The proposal involves existing county roadways. There will be no increase in run -off or any alteration in the method of collection as a**

**result of this proposal. There will be no increase in waste materials as a result of this proposal.**

d. Proposed measures to reduce or control surface, ground, and runoff water impacts, if any:

**There are no proposed measures to reduce or control impacts to surface, ground, and run -off water as a result of this proposal.**

4. Plants

a. Check or circle types of vegetation found on the site:

_____ deciduous tree: alder, maple, aspen, other
_____ evergreen tree: fir, cedar, pine, other
_____ shrubs
_____ grass
_____ pasture
_____ crop or grain
_____ wet soil plants: cattail, buttercup, bullrush, skunk cabbage,
other
_____ water plants: water lily, eelgrass, milfoil, other
_____ other types of vegetation

**The proposal involves existing roads located throughout Okanogan County. The roadways are already developed so there will be no vegetation removal from or near the road surfaces.**

b. What kind and amount of vegetation will be removed or altered?

**No vegetation will be removed or altered as a result of this proposal.**

c. List threatened or endangered species known to be on or near the site.

**The proposal involves existing roadways located throughout Okanogan County. There is no endangered plant life on the existing roadways.**

d. Proposed landscaping, use of native plants, or other measures to preserve or enhance vegetation on the site, if any:

**There will be no landscaping as a result of this proposal.**

5. Animals

a. Circle any birds and animals which have been observed on or new the site or are known to be on or near the site:

birds: hawk, heron, eagle, songbirds, other:
mammals: deer, bear, elk, beaver, other:
fish: bass, salmon, trout, herring, shellfish, other.

**The proposal involves existing roadways located throughout Okanogan County. All species with a presence in Okanogan County may be at times be new an affected roadway. The proposal does not create any new roads or open any roads not currently open to vehicle travel. The number of average daily trips is not anticipated to increase to a point where vehicle density on the roads will cause a significant increase in animal/ vehicle collisions.**

b. List any threatened or endangered species known to be on or near the site.

**The proposal involves existing roadways located throughout Okanogan County. All endangered or threatened species with a presence in Okanogan County may at times be near an affected roadway. The proposal does not create any new roads or open any roads not currently open to vehicle travel. The number of average daily trips is not anticipated to increase to a point where vehicle density on the roads will cause a significant increase in animal/vehicle collisions.**

c. Is the site part of a migration route? If so, explain.

**The proposal involves existing roadways located throughout**

**Okanogan County. The existing roads cross the mule deer migration routes (see attached map). The proposal does not create any new roads or open any roads not currently open to vehicle travel. The number of average daily trips is not anticipated to increase to a point where vehicle density on the roads will cause a significant increase in animal/vehicle collisions.**

d. Proposed measures to preserve or enhance wildlife, if any:

**There are no new measures to preserve or enhance wildlife as a result of this proposal.**

. . . .

7. Environmental health.

a. Are there any environmental health hazards, including exposure to toxic chemicals, risk of fire and explosion, spill, or hazardous waste, that could occur as a result of this proposal? If so, describe.

**There are no environmental health hazards as a result of this proposal.**

1) Describe special emergency services that might be required.

**There are no special or additional emergency services as a result of this proposal.**

2) Proposed measures to reduce or control environmental health hazards, if any:

**There are no proposed measures to reduce or control environmental health hazards.**

b. Noise

1) What types of noise exist in the area which may affect your project (for example: traffic, equipment, operation, other)?

**The proposal involves county roads already open to vehicle travel. The current vehicle noise will not affect this proposal.**

2) What types and levels of noise would be created by or associated with the project on a short-term or a long -term basis (for example: traffic, construction, operation, other)? Indicate what hours noise would come from the site.

**The proposal will result in vehicle noise in areas already open to vehicle travel. The number of average daily trips is not anticipated to increase to a point where vehicle density on the roads will cause a significant increase in vehicle noise. Noise suppression requirements are currently regulated through RCW 46.09.457 and RCW 46.09.470.**

3) Proposed measures to reduce or control noise impacts, if any:

**There are no measures proposed to reduce or control noise impacts.**

8. Land and shoreline use

a. What is the current use of the site and adjacent properties?

**The site of this proposal is currently used as county roads.**

b. Has the site been used for agriculture? If so, describe.

**The site has not been used for agriculture since the construction of the county roads.**

c. Describe any structures on the site.

**The only structures are paving or road surface treatments, guardrails and other traffic safety devices, and regulatory and advisory roadway signs.**

. . . .

f. What is the current comprehensive plan designation of the site?

**The proposal involves existing county roads which transverse a variety of comprehensive plan classifications.**

g. If applicable, what is the current shoreline master program designation of the site?

**The proposal involves existing county roads which transverse a variety of SMP classifications.**

h. Has any part of the site been classified as an "environmentally sensitive" area? If so, specify.

**No roadways in this proposal have been classified as sensitive areas.**

. . . .

l. .Proposed measures to ensure the proposal is compatible with existing and projected land uses and plans, if any:

**Public roadways are a compatible and/or permitted use in all zones.**

. . . .

10. Aesthetics

. . . .

c. Proposed measures to reduce or control aesthetic impacts, if any:

**There are no proposed measures to control aesthetic impacts.**

11. Light and glare

a. What type of light or glare will the proposal produce? What time of day would it mainly occur?

**Vehicle illumination and marker lights will be used on roadways already open to vehicle traffic.**

b. Could light or glare from the finished project be a safety hazard or interfere with views?

**This proposal does not create any light or glare beyond the**

**operation of vehicles on existing county roads none of which creates a safety hazard or interferes with views.**

c. What existing off-site sources of fight or glare may affect your proposal?

**No off-site source of light or glare will affect this proposal.**

d. Proposed measures to reduce or control light and glare impacts, if any:

**There are no proposed measures to control light or glare impacts.**

12. Recreation

a. What designated and informal recreational opportunities are in the immediate vicinity?

**The proposal involves county roads currently open to vehicle traffic. The road system is used for transportation to the recreational locations found in Okanogan County.**

b. Would the proposed project displace any existing recreational uses? If so, describe.

**The proposal will not displace any recreational uses.**

c. Proposed measures to reduce or control impacts on recreation, including recreation opportunities to be provided by the project or applicant, if any:

**There are no proposed measures to reduce or control impacts on recreational opportunities.**

. . . .

14. Transportation

a. Identify public streets and highways serving the site, and describe proposed access to the existing street system Show on site plans, if any.

**The proposal involves existing county roads already open to vehicle travel.**

(see attached map)

. . . .

f. How many vehicular trips per day would be generated by the completed project? If known, indicate when peak volumes would occur.

**It is not known the total number of vehicle trips per day generated by this proposal. It is not anticipated that any increase in vehicle trips will result in reduced level of service classification for any road in the proposal. It is likely peak volumes will occur during daylight hours in the spring, summer, and fall.**

g. Proposed measures to reduce or control transportation impacts, if any:

**There are no proposed measures to reduce or control transportation impacts.**

15. Public services

a. Would the project result in an increased need for public services (for example: fire protection, police protection, health care, schools, other)? If so, generally describe.

**The proposal will not result in an increased need for public services.**

b. Proposed measures to reduce or control direct impacts on public services, if any.

**There are no proposed measures to reduce or control impacts on public services.**

CP at 253-66.

APPENDIX B

Town of Winthrop Planning Commission Letter to Perry Huston

To date, the Town of Winthrop has declined to take a position on ATV use in town, due in large part to the fact that the Town Council would like to know how ATV traffic would be accessing Winthrop. In light of this fact, the Planning Commission find that the SEPA Checklist provides inadequate analysis of the impacts of opening all roads within the speed limit range proposed, and does not address the need for contiguous routes. We think that a more complete analysis should be performed including the following items of concern for us as a local jurisdiction within Okanogan County:

Under Section 8, Land and Shoreline Use, the Checklist states that none of the roads are classified as "environmentally sensitive," however it does not address whether these roads are in proximity or access areas that are environmentally sensitive or "critical areas." This needs to be included in the analysis to truly determine the impacts of the proposal.

Under section 12, Recreation, the checklist states there are no impacts to recreation other than to provide another means of transportation to recreational locations. We suggest you consider where these routes connect to each other and to logical trip beginning and endpoints, whether there are adequate parking/trailhead facilities available in key locations, and how ATV use will interact with other forms of recreation.

Under Section 14, Transportation, we suggest you include analysis of how the roads being opened connect to local jurisdictions such as Winthrop, and how the traffic pattern may be affected around population centers of the County. Since the proposal does not include a network of roads that connect in a way' that creates contiguous routes, we are curious how the ATVs will arrive on these sections of road, and if there is any consideration of parking for trucks and trailers.

Additionally under Transportation, we believe the checklist needs to include a reasonable estimate of the amount of traffic that this proposal will generate. Further it should describe under Section B.2. Air and Section 13. 7.b. Noise any potential impacts based on those traffic generation estimates.

Under Section 15, Public services, the Checklist concludes there are no impacts to public services. We are concerned that enacting this proposal without adequate analysis could result in impacts to local law enforcement.

Without adequate connections to parking and logical routes, there could be trespass and illegal travel across private property to reach desirable destinations. This could easily result in increased complaints and response time for local law enforcement.

CP at 333-34.

APPENDIX C

May 2, 2014, Methow Valley Citizens Council and Conservation Northwest Joint

Submittal to the Okanogan County Office of Planning & Development

MVCC and CNW believe that in reaching a DNS, the County failed to analyze 1) the likelihood of significant impacts on sensitive lands and waters, including fish and wildlife habitat, from illegal off-road riding facilitated by opening certain roads to ATVs; 2) the impacts on traffic of ATVs traveling on roads with speed limits over 35 mph, either because of confusion over where ATVs are and are not allowed, or because the operator wants to traverse an unauthorized road segment with a higher speed limit to access an isolated authorized road segment; 3) the impacts on public services from the need for additional traffic patrol and enforcement to keep ATVs from riding off-road and the need to post signs indicating where ATVs are and are not allowed; and 4) the actual traffic impacts of additional vehicles on the roads that would be open to ATVs under this proposal.

1. The evidence of damage to lands, waters, vegetation, and fish and wildlife habitat from illegal off-road riding is overwhelming, and the County has failed to consider the significant impacts of Illegal off-road riding that can be anticipated from opening roads in environmentally sensitive areas.

In many responses in the SEPA Checklist, the County presumes that ATVs are exactly like all other vehicles that are already allowed on the roads and considers only the impacts to the road itself from opening the road to ATVs. On the contrary, the very name "all-terrain vehicles" means that these vehicles are designed, marketed and intended for off-road use. Unfortunately, not all operators stay on the road when they are riding in a vehicle that was designed and intended for off-road use, even when off-road use is prohibited. This statement is not speculation; it is established fact. In Appendix B we have included references to numerous studies and observations of damage to land from illegal off-road riding of ATVs. In light of the overwhelming evidence, it is simply unreasonable and inconsistent with SEPA to ignore the fact that illegal off-road riding is widespread and to assume that all ATV operators will obey all laws.

For example, under the topic of Earth on page 3, the checklist asks about steepness of slopes, kind of soils affected, history of unstable soils, likelihood of erosion, and measures to control erosion. Every response asserts that only "already existing roadways" will be affected. This view turns a blind eye to the probability of illegal off-road operation of ATVs. The evidence shows, however, that off-road riding is likely and that it will cause erosion, particularly in areas of steep slopes or unstable soils. Consequently, the County must assume some amount of illegal riding and assess impacts on soils adjacent to roads, especially in areas of steep slopes or unstable soils.

Similarly, in the Environmental Element of Water on page 4, there are questions as to whether the proposal is adjacent to or within 200 feet of surface water bodies, including "year-round and seasonal' streams, saltwater, lakes, ponds, wetlands." The County's stock answer is the same as for the element of "Earth:" only "existing county roadways" will be affected. Again, this answer ignores the fact that off-road riding can adversely affect water bodies either by ATVs riding directly through streams or by causing erosion that can end up in streams.

The checklist continues in the same vein. n responses to questions regarding the next two elements - Plants and Animals - the County repeatedly asserts that there is no vegetation affected and no animals affected because ATV travel will-take place on "existing county roadways." There is no consideration of impacts to vegetation or wildlife adjacent to, or made accessible by, existing roads. Once again, it is incumbent on the County to acknowledge that ATVs are not like most other vehicles in that they are designed and intended for off-road travel. The literature is replete with examples of serious damage to vegetation and, wildlife habitat - including spawning streams for endangered fish - from illegal off-road riding. (See especially studies referenced by Backcountry Hunters & Anglers, Appendix B.)

Other responses in the checklist fail to consider the likelihood of damage from off-road riding. On page 8, the checklist asks: "Has any part of the site been classified as an environmentally sensitive area? If so, specify." The County's answer is: "No roadways in this proposal have been classified as sensitive areas." Similarly, in response to question 4, page 13, the County acknowledges that the roads to be opened to ATV traffic "are in some cases located next to areas under regulatory protection or eligible for regulatory protection," but that this is not an issue because "the proposal

involves existing county roads currently open to vehicle traffic." Off-road damage is not mentioned. Finally, in response to question 2, page 13, the County states that "the proposal, involves existing county roads already open to vehicle travel. There will be no impacts to plants, fish, or marine life. The proposal does not create any new roads or open any roads not currently open to vehicle travel."

Many miles of roadways in the proposal travel through, or give access to, Washington Department of Fish & Wildlife (WDFW) Wildlife Areas or state parklands. (See attached road list, Appendix A that shows roads in the proposal that access these public lands in the Methow Valley.) Surely there are environmentally sensitive areas on these lands, but the County has failed to ascertain the extent to which these areas may be adversely affected by off-road riding facilitated by this proposal. WDFW and State Parks prohibit ATVs both on and off road, yet the proposal would provide ATV access to and through these lands, thus creating an enforcement nightmare for these agencies.

Many other miles likely are adjacent to spawning streams of at least one of the County's three federally listed threatened or endangered fish species, but the County has failed to do any surveying or mapping to determine what protected species or their habitat may be made vulnerable to ATV access by this proposal. On page 14, the checklist asks: "How would the proposal be likely to affect land and shoreline use, including whether it would allow or encourage land or shoreline uses incompatible with existing plans?" The County response is: "The county roads are in some cases located next to areas, under shoreline protection." This is another example of sensitive areas that may be affected by the proposal.

In sum, there is no rational basis for assuming that there will be.no damage to adjacent or accessed lands from illegal off-road riding. To the contrary, there is ample evidence that the only reasonable assumption in conducting a SEPA analysis on this proposal is that there will be some illegal riding and consequent damage to soils, water bodies, shorelines, vegetation, wildlife, protected species, and governmentally protected sensitive areas. To reduce the likelihood of that damage, MVCC and CNW request that roads that travel through, or provide access to, WDFW lands or state parklands be removed from this proposal. In the alternative, we request that the County conduct a comprehensive survey to determine where roads give access to sensitive lands, waters, or fish and wildlife habitat and remove those roads from the proposal.

2. The County failed to consider the impacts on traffic of ATVs traveling on roads with speed limits over 35 mph, either because of confusion over where ATVs are and are not allowed, or because the operator wants to cross a segment with a higher speed limit to access an isolated open segment.

The proposal includes many isolated short segments that allow longer rides only if the operator illegally rides on roads that have speed, limits over 35 mph. (See Appendix A for a list of these roads in the Methow Valley.) It is likely that some riders will ride on segments or roads with higher speed limits, either because of confusion over where ATVs are and are not allowed, or because the operator wants to traverse an unauthorized segment with a higher speed limit to access another authorized road or segment. The County has not indicated intent to install signs to make it clear where ATVs are not allowed, and to do so would be prohibitively expensive. The County assumed that despite the disconnected patchwork of short segments connected only by roads or segments with higher speed limits, all ATV riders would both 1) understand where they may and may not ride, and 2) stay only on roads on which ATVs are allowed. This is an unsupported and unrealistic assumption.

In the Methow Valley alone, MVCC and CNW have identified at least twenty six (26) road segments, less than one mile long and ten (10) between one and two miles long. In addition, MVCC has identified other road segments longer than two miles which offer no realistic opportunity for ATV travel due to being loop roads that begin and end at roads closed to ATVs, and no parking for trailers is available.

To correct this error, MVCC and CNW request that the County remove from the proposal all road segments less than two miles long and those loop roads which connect only to roads with speeds greater than 35 mph. Those segments for the Methow Valley are shown in Appendix A (columns K, L, and N).

3. The County failed to consider the impacts on public services of the need for additional traffic enforcement to keep ATVs from riding off-road and to post signs indicating where ATVs are and are not allowed.

Already thin local police and sheriff resources will be needed to enforce the laws governing ATVs. These include: licensing, safety equipment, underage riders, speeding, and most especially responding to complaints about riding on closed roads or off-road. To reduce the impacts of off-road riding and riding on roads with speed limits over 35 mph

discussed above, the County should, provide additional traffic enforcement and post signs indicating where ATVs are and are not allowed. This would increase the cost of both police protection and public works. Yet the County states that "the proposal will not result in an increased need for public services." (Page 12, question 15) Either necessary signage and enforcement will be lacking, or there will be an impact on public services that must be evaluated and disclosed.

4. The County failed to consider the actual traffic impacts of additional vehicles on the roads that would be open to ATVs under this proposal.

The County admits that it does not know the number of additional vehicle trips per day or at peak times (e.g., weekends and holidays in spring, summer, and fall), and it made no attempt to estimate those numbers. (See page 11, response to question 14.f: "It is not known the total number of vehicle trips per day generated by this proposal. . . . It is likely peak volumes will occur during daylight hours in the spring, summer, and fall.") Consequently, the County does not know whether the increase in traffic by itself - even without off-road riding - will increase impacts to environmental elements such as road surface erosion, dust irritants, animal/vehicle collisions, or other environmental elements. Yet the County states without evidence that "there is no erosion anticipated as a result of this proposal" (page 3, response to question 1.f) and that "the number of average daily trips is not anticipated to increase to a point where vehicle density on the roads will cause a significant increase in animal/vehicle collisions." (Page 6, response to question 5.a, b, and c, and page 13, response to question 2)

Surely there is information available on the amount of traffic generated by opening roads to ATVs, since there are 336 miles of roads in the County that are already open to ATVs. This information should be used to estimate the increase in traffic - especially at peak times – that can [be] expected from this proposal. If this information is not available, it is because the County has failed to monitor the impacts of opening roads to ATVs, as it should have before opening more miles of roads. Required mitigation measures for any proposal opening roads to ATVS should be 1) monitoring the increase in vehicle traffic on roads popular with ATVs and of animal/vehicle collisions on these roads; 2) increased road maintenance where there is significantly more traffic due to the presence of ATVs; and

3) closure of roads in which there is an increase in animal/vehicle collisions:

Requested Action

MVCC and CNW request that you withdraw the DNS and issue a Determination of Significance on the proposal. Following that determination, we ask that you either 1) prepare an environmental impact statement for the proposal, or 2) issue a new proposal and prepare a SEPA analysis for the new proposal, including a request for public comment.

The new proposal should:

Remove all roads in Appendix A that are shown in red. (The reason for removing a road from the proposal is shown in the columns following the road name. There may be more than one reason for removing a particular road.) In particular, we request that roads that travel through, or give access to, WDFW lands or state parklands be removed from this proposal. In the alternative, we request that the County conduct a comprehensive survey to determine where roads give access to sensitive lands, waters, or fish and wildlife habitat and remove those roads from the proposal.

Include a plan with cost estimates for timely installation of signs to indicate where ATVs are and are not allowed.

Include a plan with cost estimates or monitoring increases in vehicle traffic on popular ATV routes and performing added maintenance on roads with significantly increased traffic.

Include a plan with cost estimates for monitoring animal/vehicle collisions on popular ATV routes and closing roads with a significant increase in collisions.

CP at 336-40 (footnote omitted).

## APPENDIX D

A sample of ATV ordinance supporter comments

I have been riding ATV's in Okanogan County and other counties in this state for over 25 years. During that time I estimate I have ridden 20,000 plus miles on four different ATV's I've owned. Based on this experience and my experience as an Okanogan County Deputy Sheriff, I believe that it is totally safe and appropriate to open these roads to ATV's properly licensed and driven by licensed drivers.

Thomas Windsor

Orv's handle the gravel dnr, usfs, and county roads better than cars; trucks, and motorcycles.

Thank you
Gary L Allard

My husband and I are senior's [sic] and are hoping our County Commissioner's [sic] are able to open all existing County roads with speed limits of 35 or under.

Rodney and Marie Maberry

I am 100% in favor of ATVs on ALL county roads no matter what the posted speed is. I though[t] this issue has ready been resolved . . . seems silly to me how some folks like to stir up trouble trying to prevent others from recreating.

Danny M Whisler

I am a resident of Okanogan County in the Upper Rendezvous near Winthrop. I just wanted to comment that the county is doing a good job in offering this proposal. Since there are existing roads throughout the county and National Forests that already permit travel by motorized vehicles including cars, trucks, dirt bikes, etc., there is no sense or point in restricting ATV's, UTV's, SSV's or similar vehicles from using these same roads.

As an avowed environmentalist, I would strongly resist the creation of additional roads in these areas. But since these roads already exist AND motorized traffic is permitted, then they should be opened to ATV's. The

existing laws regarding off-road traffic must be enforced rigorously to prevent ruining the beautiful aesthetic qualities of the County. The problems, where they do exist, are with the drivers NOT the vehicles.
Dan McFeeley

I am a resident of the Methow Valley, specifically located on the East Chewuch Rd. I watch many trucks with loud exhaust and endless motor bikes with no exhaust drive right by my house all day long. I would rather hear a little ATV go riding by on their way to spend money in the Town of Winthrop. With my Recreation degree from Pacific Lutheran University, I know how important recreation is in our lives. Whatever your sport is, it is important to have moments in our lives to release stress. Hiking, biking, snowmobiling, ATV riding, and even bird watching have positive effects. It is really sad to see people of the Methow be so prejudice[d]. Choosing to be a Prejudice Recreationalist is not fa[i]r to the people whose sport they are trying to control. Everyone will learn to get along.
I support all ATV Riding in all of Okanogan County. I don't even own an ATV.
Craig Stahl, Winthrop

We have received a copy of the Notice Packet re: Opening ATV Routes in Okanogan County and would like to comment on the SEPA Determination of Non-Significance. We ask that our comments be included in the official project record.
Premier Polaris is the largest - stocking Polaris dealership in Washington state, representing approximately 10,000 ATV enthusiasts that are interested in preserving access to our public lands, increasing recreation-based revenue for Washington's rural communities, and fostering a new culture of responsible ATV riding. We are members of the Sky Valley Chamber of Commerce, the Port-to-Pass Recreational Innovation Zone and a statewide collaborative that led to the passage of ESHB 1632 (regulating the use of off-road vehicles) in 2013 and HB 2151 (the Washington State Trails Act) in 2014.
We would like to offer the following general comments re: the above-mentioned ordinance:

1. We support the ordinance allowing the operation of All Terrain Vehicles (ATVs) on approximately 597.23 miles of existing county roads with a speed limit of 35 mph or less.

2. With respect to emissions, the U.S. Environmental Protection Agency (EPA) long-ago [sic] established emissions standards for off-road vehicles (ORVs). All ORVs sold in Washington are required to comply with the emissions limits in those standards. By establishing and enforcing such standards, the EPA made a policy determination that ORV emissions levels are acceptable for the vehicles to be used throughout the United States.

3. Washington state law limits ORV sound to 86 dB(A) when tested in accordance with SAE J331a. By comparison, a vacuum cleaner emits sound of 80-89 dB(A).

4. With respect to alleged damage to existing roads, Washington state law limits ORV weight to 2,000lbs. By comparison, a 2014 Jeep Wrangler weighs over 3,700 lbs. In addition, ORVs generally have soft, low-pressure tires, which may limit surface damage.

Please include this information in the SEPA analysis and place our name on the mailing list of interested parties so that we may be kept informed of your progress on this matter. We can be reached at 360 - 794-8669 or via email info@premierpolaris.com should you have any questions.

Lisa Driscoll, Owner  Randy Driscoll, Owner
Monroe, WA

Please log my comments in recognition and agreement with the determination of non-significance in regard to allowing the operation of All Terrain Vehicles (ATV's) on approx. 597.23 miles of existing county roads with a speed limit of 35 mph or less. I am in full support of opening the suggested roads to allow ATV's to travel on them. My vacation dollars will be spent locally with these roads opening rather than those dollars going to Montana or Idaho as they have done for a couple years now! It is only common sense that lighter more fuel efficient vehicles allowed on our roads is more environmentally conscious, just the opposite of having a significant impact on our environment.

Doug Smith, Puyallup

The Association of Okanogan County Snowmobile Clubs is composed of all of the snowmobile clubs in Okanogan and Ferry Counties

plus the Mountain Trails Grooming Association. Many, if not most, of the Association Clubs' members are ATV riders as well as snowmobile riders.
The Association supports the opening of 35 MPH County roads to ATV use.
Thomas Windsor

CP at 370, 371, 378, 385, 387, 395, 398, 399, 401.

APPENDIX E

2011 compilation by Backcountry Hunters & Anglers of scientific studies

Natural resources are affected by ATV use (Meadows et al. 2008). All-terrain vehicle use affects soil and hydrologic function primarily through soil compaction, increased soil strength, and removal of the forest litter layer in temperate environments (Ouren et al. 2007). Soil compaction and the removal of the forest litter layer can reduce vegetation growth (Webb et al. 1978) and is a primary factor in accelerated erosion rates (Megahan 1990). . . .

. . . .

Compaction resulting from ATV travel reduced hydraulic conductivity 8% at the MT [Montana] site, 59% on the LA [Louisiana] site, and 51% at the WA [Washington] site (Meadows et al. 2008). The changes in soil structure and physical properties described by Meadows et al. (2008) highlight the potential for ATV use to result in significant degradation of hydrologic function over relatively short time frames.

. . . .

All-terrain vehicle travel increases erosion and sediment concentrations by removing soil cover and compacting the soil thus decreasing infiltration. Sediment delivery to streams via erosion is a result of ATV travel (Misak et al. 2002). Increased sediment loading decreases water quality, fish habitat quantity and quality, and fish reproductive success (Newcombe and MacDonald 1991). The increase in runoff and sediment transport can be substantial. Meadows et al. (2008) compared the effects of ATV traffic across seven sites on diverse landscapes ranging from the Wenatchee National Forest in Washington State to the Land Between the Lakes in Kentucky and concluded that "ATV trails are high-runoff, high sediment producing strips on a low-runoff, low sediment producing landscape." . . . Meadows et al. (2008) reported a decline in soil cover from 70% on undisturbed sites adjacent to ATV trails to 17.6% after 40 ATV passes in Montana. The decline in soil cover at the MT site resulted in increased surface runoff and suspended sediment concentrations. Suspended sediment concentrations in the runoff increased 50% over pre-disturbance levels after 40 ATV passes. . . . Suspended stream sediments rose approximately 94X downstream of an ATV trail crossing relative to

sediment concentrations above the ATV trail crossing. The results of the paired watershed study led the authors to conclude that increases in suspended stream sediment were a result of a combination of highly erodible silt loam soils (common in the Inland Northwest of the United Sates) and ATV trails acting as conduits for suspended sediment (Ricker et al. 2008). . . .

Impacts of ATV traffic on water quality and aquatic systems are not limited to increases in suspended stream sediments. ATV trails funnel water that dislodges contaminants which end up in streams, rivers and lakes (Ouren et al. 2007). Contaminants can also be directly introduced into aquatic systems through oil and fuel spills and wind deposition of emission particulates that are transported in dust migration, settle onto vegetation, and subsequently washed off leaf surfaces by rain and snow and moved by surface water run-off. All-terrain vehicle operation in or near streams and waterways poses a serious water pollution threat (Havlick 2002). This can have detrimental impacts on populations of aquatic animals. Garrett (2001) (as cited in Taylor 2006) reported that environmentally sensitive aquatic species (including fish) were absent from OHV impacted sites on the Nueces River in Texas, while unimpacted sites hosted numerous environmentally sensitive species. The magnitude of the effect ATV use has on water quality is influenced by trail features including trail curvature and slope percentage.

. . . .

ATV impacts on vegetation are not limited to removal of vegetative soil cover. Reduced plant growth rates and populations of native species coupled with increases in non-native and pioneering plant species are directly related to ATV travel (Ouren et al. 2007). Destruction of biological soil crusts in desert environments reduces nitrogen fixing organisms that are the dominant source of nitrogen in and ecosystems (Belnap 2002). This negatively affects plant performance because nitrogen is the element most limiting plant growth in desert environments other than water (Romney et al. 1978). . . .

. . . .

This review of the impact of ATV use on the physical environment suggests that the impacts are not only universal and cumulative, but that much of the damage associated with their operation can be induced by a limited number of users over short time periods. Several researchers suggest the cumulative impacts of ATV use exceed the lands ability to

recover naturally, and that recovery to pre-disturbance conditions can take generations. Additionally, the effects of ATV traffic on -site result in environmental consequences off-site (Ouren et al. 2007), significantly increasing the amount of land affected by localized ATV use (Brooks and Lair 2005). For example, Meadows et al. (2008) asserts that while a meadow may recover from a single pass in a relatively short time frame, multiple passes often result in damage that natural processes are unable to mitigate. This is supported by Lathrop and Rowlands (1983) who state unequivocally that "restoration (of sites degraded by ORV's) as a management objective is for all practical purposes unattainable as long as ORV activity occurs."

. . . .

Other critical points on the impacts of ATV use on the physical environment are:

The impacts of ATV use are cumulative, universal, and can be achieved by low intensity traffic over short time periods.

ATV use effects soil and hydrologic function primarily through soil compaction, increased soil strength, removal of the forest litter layer, and destruction of soil crusts.

These changes in soil properties increase erosion and stream sediment deposition and decrease plant productivity.

Seasonal restrictions on ATV use are necessary to limit the impact of ATV use on soils, vegetation, and watersheds.

Restricting ATV use in areas of low road density is necessary to reduce the spread of invasive species and protect the community structure of native species.

ATV impacts on the environment are similar regardless of the type of ATV. Recovery from the impacts of ATV use to pre-disturbance conditions can take generations.

Restoring sites degraded by ATV's is unfeasible as long as ATV use continues.

. . . .

All-terrain vehicle travel can have a profound effect on all forms of wildlife. Concerns about the effect of off-highway travel on wildlife include: direct mortality (Bury et al. 1977; Bury et al. 2002), habitat fragmentation (Ouren et al. 2007) and reductions in habitat patch size the size of an unfragmented "patch" of land that supports at least one population of wildlife (Reed et al. 1996; Forman et al. 2003), increases in

100

the edge: interior habitat ratio (reductions in animal populations at the edge of forest habitats referred to as the "edge effect"), and alteration of animal behavior (Canfield et al. 1999; Rowland et al. 2000; Wisdom et al. 2004a). Although direct mortality of ungulates resulting from collisions with ATV's is low, mortality of several species of reptiles have been documented due to off-highway travel (Brooks 1999; Grant 2005).

. . . Habitat fragmentation can disrupt wildlife movements between and within habitats (Forman and Alexander 1998; Jackson and Griffin 1998), which can have negative consequences for endemic species and may encourage non-native and invasive species propagation (Lovallo and Anderson 1996; Jackson and Griffin 1998). . . . Habitat fragmentation can reduce reproductive success among nesting birds and is believed to be the main culprit in population reductions in some species of forest birds (Robinson et al. 1995).

Alteration of animal behavior resulting from disturbance (motorized or non - motorized) ranges from immediate, short term temporary displacement to permanent abandonment of favored feeding areas (Geist 1978). According to Trombulak and Frissel (2000), animal behavior is modified through five mechanisms:

1. altered movement patterns
2. changes in home range
3. altered reproductive success
4. altered escape response
5. altered physiological state . . .

The effect of ATV travel on elk, and more generally, the effect of roads on elk, has been a focal point for researchers because of the documented aversion elk have to roads open to motorized travel (Cole et al. 1997; Rowland et al. 2000), and for their social, economic, and recreational importance (Naylor et al. 2009). . . .

. . . .

Elk (especially economically and biologically significant bull elk) preferentially use areas devoid of motorized activity.

Elk require large blocks of non-motorized habitat for security.

CP at 73-89.

APPENDIX F

Letters and Declarations from Okanogan County Residents to the Board of County

Commissioners

On June 11, 2014, Pearl and Howard Cherrington sent the Board of County

Commissioners photographs taken near Twisp River Rd that showed damage caused by

off road vehicles. The speed limit in the location of damage was 40 m.p.h. The

Cherringtons alleged that operation of ATVs in unlawful areas was a continuous problem

and that, despite reporting the illegality to authorities, riders leave the area before police

arrive.

John Olson, of Winthrop, wrote to the Okanogan County Commissioner about a

new neighbor:

> As we all know, ATVs have the capability of travelling across most landscapes, hence the term "all terrain." Manufacturers actually discourage ATV use on paved roads while extolling their abilities on all other surfaces.
>
> I have personally witnessed ATV abuses on public lands in southern Idaho where I lived and worked for 27years, but I will also describe to you our recent experiences with illegal ATV use and impacts in Okanogan County.
>
> New neighbors recently moved into a rental house along the Methow River near our home and property. They are surrounded by private property and roads (Wolf Creek Road) closed to ATV use. In May of this year, we found them riding their ATVs on our property and damaging vegetation within the river corridor. They subsequently used a private road to access Wolf Creek Road and rode their ATVs on that road to a location unknown to us. I reported that incident to the Okanogan County Sheriff's Department and was told that they did not know if ATV use on Wolf Creek

Road was legal or not. They said they would check with the County Commissioners, but I never heard from them again.

After this episode, our new neighbors then used their ATVs to travel on the Methow Valley Sport Trails Association (MVSTA) ski trail. This trail is closed to motorized use and, again, is located on private property where owners have granted an easement to MVSTA for non-motorized use.

A particularly galling aspect of these incidents is the attitude of these ATV users to disregard any private property rights and just charge ahead with travelling over any terrain accessible to them. They never even had the decency to ask permission before cruising the private properties on their machines.

This is just one example of the impacts that are reasonably certain to occur with expanded ATV use in Okanogan County. Any reasonable person would recognize that such impacts will occur and need to be considered in the environmental evaluation of such expanded ATV use. The infringement on property rights, the impact to natural resources, and the limited ability of law enforcement personnel to respond to violations are all legitimate reasons to more fully evaluate the impacts of expanded ATV use in Okanogan County

CP at 157.

Lawrence David Hooper, a sixty-five-year-old resident of Twisp, submitted a declaration. Hooper averred:

On Saturday, May 25th, 2013, my wife, Erika Stephens, and my stepdaughter, Rachel, returned from dinner in Winthrop at approximately 7:15 pm. Rachel and I went down into the house and Erika stayed outside to feed the chickens. Five minutes later, Erika ran into the house saying that there were two men on an ATV who had driven right up onto our lawn, who were demanding to recover another ATV. She asked them to leave, having no idea what they were talking about, and they responded by calling her a "bitch." I called 911 and went up to see what was going on.

I was met by two men (last name Volvotny, if I remember correctly), one sitting on his ATV, glowering, and, the other, a younger man, approached me, and told me that he and his father, (referring to the man on the ATV) were in the Coast Guard, and he asked, "You do respect the

Military don't you?" I responded that I did not understand how the issue of my respecting or not respecting the military had any bearing on their trespassing on our land. Both men appeared to be drunk. While this is going on, I am simultaneously talking with the dispatcher from the Okanogan Sheriff's Department. She encouraged me to ask the two men to leave our property and wait for the Sherriff at the bottom of our driveway. This I did repeatedly, only to be met with hostile glares. At one point in this exchange, when Erika had come back up to our lawn, the father said, "We're in the Coast Guard. If you don't help us, we won't help you when you need the Coast Guard." Finally the younger one said, "We just want to retrieve our other ATV," and he pointed up the hill. "I mean, accidents happen!" he said. There, about 100 feet from one of our buildings, was a ruined ATV. It was explained to me that they had lost control of it on the top of the hill, which is also our property. The father claimed he had seen other ATVs on my land in the past (not to my knowledge, or to the knowledge of my neighbors who can see the side of my property not visible from our house). At this point the father and son, hoping to find a way to retrieve their wrecked ATV drove out my driveway, went back upon the hillside in back of our buildings, supposedly to survey away of approaching the wrecked ATV, in spite of my having explained to them that by doing so they would still be trespassing. At this time their two friends showed up below my house with a small flatbed trailer. And Deputy Ottis Buzzard and an officer from Twisp approached them. The father and the son seeing the officers went down the back side of my hill and drove down Balky Hill to the flatbed trailer and their friends, who were the actual owners of the wrecked, brand new ATV.

Deputy Buzzard came up to our home and we rain him through the details of our encounter. He explained to us that we were legally obligated to let them take their ruined vehicle away. The two young men who owned the vehicle approached us and I explained very specifically how to approach the ATV to be retrieved. . . . I was hoping to minimize any damage to the land and vegetation by their 'having to drag the wrecked ATV.

Erika and Rachel and I went back into the house and Deputy Buzzard left. It was dark when they finally drove up the hill with the Volvotny's ATV, but instead of following my instruction drove up within sixty feet of the house and dragged the wrecked vehicle down the hill, not on the fire break but however they found most convenient.

I was encouraged to contact Stephen King of the Conconully ATV club. I was told that he was very vocal about the need for ATVers to police themselves and act responsibly. I do not recall if I e-mail[ed] him or called and left a phone message. I received no response. A few days later my wife called him, and left a message; she never heard from him either.

I suspect that the vast majority of ATVers are responsible and considerate people. We don't need to worry about them. We need to worry and clearly have reason to worry about those who are not considerate or responsible. ATVs are meant for off road travel. There will be damage to private property, there will be trespasses, there will be accidents that result in injuries, and possibly deaths. These all need to be given careful and clearheaded consideration when decisions are made about opening up roads to the use of ATVs.

CP at 158-62. Hooper inserted a photograph of the damage to his land from dragging the

ATV. CP at 61.

Philip Millam also proffered a declaration to the Board of County Commissioners.

Millam declared:

I am a fulltime resident of the Methow Valley residing at . . . Winthrop. I live close to lands managed by the Washington State Department of Fish and Wildlife (WDFW).

In the summer of 2008 I was working on my former property on Lonesome Grouse Road near Winthrop when I heard noise from ATVs coming from WDFW land. The land is part of the Methow Wildlife Area, known as Little Cub Creek. The land lies between the Cub Creek Road and the Rendezvous Road. The land includes both riparian and shrub steppe. I walked to a vantage point, and saw four ATVs on WDFW land riding uphill toward my land. On one occasion they stopped and appeared to be cutting a wire fence separating the WDFW land from private land. As they approached my land, I fired two black powder blanks in the air from my 12 gauge over and under shotgun. This appeared to get their attention. At no time did I point my gun in their immediate direction or threaten them. The ATVs departed my land forthwith, heading back in the direction from which they came.

105

In September or October of 2013 I was returning from the gun range near Perrygin State Park when I observed two ATVs riding on grassy lands belonging to WDFW, just off the Upper Bear Creek Road. They were doing "doughnuts" on the field, and leaving deep tire impressions. I stopped my truck, and politely informed the young riders that they were riding illegally on public land. Their reply was that they had heard that "... it was OK to ride anywhere in Okanogan County." I assured them that that was not the case. They asked where they could ride legally, and I said I did not know, but that riding off-road on public lands was not legal. I then left the area, but as I looked back the ATVs continued to ride on WDFW lands.

It is my belief, based on my experience with ATVs riding illegally on public land, that opening additional county roads to ATVs will only increase illegal riding and increase confusion among those ATV riders who would otherwise choose to ride legally.

CP at 169-70.

APPENDIX G

Letter from ATV Safety and Health Care Professionals to Board of Commissioners

As individuals and organizations dedicated to reducing deaths and injuries caused by All-Terrain Vehicles (ATVs), we urge you to oppose efforts to allow recreational riding of ATVs on county roads.

The proposed ordinance would open approximately 597 miles of county roads with a speed limit of 35 mph or less to ATVs. This expansion of ATV access to roads is contrary to public safety and puts the operator and others at risk of severe injury or death.

ATVs should not be driven on public roads because driving ATVs on public roads is more dangerous than operating them off-road, ATVs are not designed for roadway use, and ATV manufacturers have policy statements strongly urging consumers not to operate their vehicles on public roads.

ATV roadway crashes account for over 60% of deaths and over 30% of serious injuries. Roadway crashes are more likely to involve multiple fatalities, carrying passengers, collisions and head injuries. Victims in roadway crashes were less likely to be wearing protective gear such as helmets and were more likely to be carrying passengers.

Most importantly, ATVs are not designed to operate on paved or public roads. An ATVs narrow wheelbase and high clearance are designed for riding in pastures, fields and wooded areas. The high center of gravity increases the risk of rollovers, particularly at roadway speeds. In addition, ATV's knobby, low- pressure tires allow for operation on a variety of surfaces, but they do not grip roadway surfaces well (paved or unpaved). As tire - surface interaction deteriorates with increasing speed, the operator can lose control of the vehicle, endangering not only the ATV rider but also occupants of other vehicles, pedestrians, and bicyclists. In addition, many ATVs lack a rear differential which can compound on-road handling challenges. The lack of a rear differential results in the wheels on both the inside and outside of a turn rotating at the same speed even though the wheels on the outside of the turn cover more distance. This design problem is mitigated on off-road surfaces like dirt and grass but makes the machine much more difficult to control on-road.

. . . .

. . . In addition, the mandatory rules for ATVs require that all ATVs have a label indicating that ATVs should not be operated on paved roads or on public roads. . . .

. . . .

We urge you to oppose this expansion of ATV use on public roads because it places the public including ATV operators, pedestrians, bicyclists, and all motor vehicle drivers and their passengers at unnecessary risk.

. . . .

Rachel Weintraub, Legislative Director and Senior Counsel Consumer Federation of America

Sue DeLoretto-Rabe, Co-Founder Concerned Families for ATV Safety

Gerene Denning, PhD Emergency Medicine University of Iowa, Iowa ATV Injury Prevention Task Force

Benjamin Hoffman MD FAAP Professor of Pediatrics Medical Director, Doembecher, Children's Safety Center Portland, OR

Katie Kearney Concerned Families for ATV safety Member Massachusetts Safety Advocate

Mary Aitken, MD MPH Director, Injury Prevention Center at Arkansas Children's Hospital

Jamie Schaefer-Wilson, Executive Director The Safety Institute

Michael Best, Policy Advocate Consumer Federation of America

Carolyn Anderson, Co-Founder Concerned Families for ATV Safety

Charles Jennissen, MD Emergency Medicine University of Iowa, Iowa ATV Injury Prevention Task Force

Ben Kelley, Director, Injury Control Policy The Trauma Foundation San Francisco General Hospital San Francisco, CA

Robin D. Schier, DNP, APRN, CPNP AC/PC Pediatric Emergency Medicine Texas Children's Hospital Houston, Texas

Gary A. Smith, MD, DrPH President, Child Injury Prevention Alliance

Gordon S. Smith, MD (MB.ChB, Otago), MPH Professor Department of Epidemiology & Public Health, University of Maryland School of Medicine Charles "McC." Mathias National Study Center for

Trauma and EMS Shock, Trauma and Anesthesiology Research. —
Organized Research Center.

CP at 176-78.

33194-6-III

KORSMO, J. (dissenting) — There is a total disconnection between the county ordinance and the appellants' claim of harm. Okanogan County does not have to account for the possibility that some wheeled all-terrain vehicle (WATV) riders may comply with the new law in order to disobey other laws. The county gave that pitifully weak argument more than sufficient consideration and, unsurprisingly, rejected it. We should be affirming that determination.[1] The county properly issued its determination of non-significance (DNS).

Following the lead of state law, the county ordinance opens up thousands of miles of county roadway to use by licensed and inspected WATVs that are required to have numerous vehicle safety features. LAWS OF 2013, 2d Spec. Sess., ch. 23, § 7 (Engrossed Substitute H.B. (ESHB) 1632). The WATVs are a subclass of the off-road vehicle (ORV) scourge that appellants seek to restrict. RCW 46.09.360(2). The State Environmental Policy Act, ch. 43.21C RCW, challenge here, however, is not a winning argument because this ordinance, and the statute on which it is based, neither address nor contribute to the problems caused by off-road operation of any vehicle.

_____

[1] With the exception of the merits of the State Environmental Policy Act, ch. 43.21C RCW, claim, I concur in the result of the majority's other rulings.

The only changes required by the new ordinance will be in the printing and posting of the new road ordinance and, perhaps, a few new road signs. No new asphalt or gravel will be poured. No dirt will be paved and no trees will be felled. A certain subclass of ORVs will be permitted lawfully to drive on existing roadways alongside more traditional vehicles. Those are the only changes wrought by the ordinance. The county understandably looked at these minimal changes to the existing order, considered those changes in light of the environmental checklist, and reasonably determined that no significant environmental concerns were created by letting WATVs share the county roads with cars and trucks. Many of the commentators properly focused their challenges to the ordinance due to its opening of the existing *roadways* to WATV travel. The Confederated Tribes of the Colville Reservation pointed out that county roadways within its jurisdiction could not be opened to WATV travel. The county responded by repealing its first ordinance and removing the roadways on the tribal lands from the next iteration. The towns of Twisp and Winthrop objected to the potential for increased emergency services resulting from vehicle-WATV collisions. Those complaints did not fare as well. Nonetheless, they were considered.

However, appellants (and the majority) fault the county for not considering in more detail actions that the ordinance neither authorizes nor pretends to authorize. The ordinance does not authorize WATVs (or other vehicles) to leave the roadway and travel in ditches or other off-road locations. It does not encourage WATVs to leave the

2

roadway to desecrate sensitive lands or scare farmer McDonald's cow. It no more facilitates crimes against the environment than granting a building permit for a new bank facilitates bank robberies. There will always be people who violate the laws, but we do not measure the environmental impacts of a new regulation by looking to the conduct of those who violate other laws.

In a more perfect world ORVs would not have been invented. In a more enlightened jurisdiction, the pestilential devices would be banned. However, we live in neither locale. The policy of this state is to encourage responsible use of our beautiful environment by all comers in differing manners, even though not all uses are compatible. To that end we permit ORVs and attempt to manage them by allowing them to be used in places that do not cause significant environmental damage. ESHB 1632 is the most recent compromise related to ORV usage. It encourages use by licensed operators of road-worthy WATVs on existing roads, at the discretion of local authorities, if those vehicles have passed an inspection and obtained a vehicle tag. By providing additional legal and safe places to drive WATVs, the bill diverts them from the off-road areas and, hopefully, lessens improper use of the devices in more sensitive areas. By bringing the local ordinance into conformity with state law, the county acted consistent with the policy of ESHB 1632 to end the varying and confusing laws governing use of WATVs. LAWS OF 2013, 2d Spec. Sess., ch. 23, § 1.

3

Not satisfied with the political compromise reflected in ESHB 1632, the appellants maintain a guerilla war against irresponsible ORV operators by attacking their innocent brethren, the responsible WATV owners who are willing to comply with state law in order to lawfully use existing roadways. However, evidence of irresponsible off-road use of ORVs is irrelevant to assessing the environmental impact of allowing regulated WATVs to use existing roadways alongside other responsible, licensed vehicle operators.[2] It is not even an apples and oranges comparison. The county understandably noted the lack of relevance of the appellants' argument to the ordinance at hand. It properly focused on the impact of lawful uses permitted by its ordinance and discounted the impact of unlawful behavior not regulated by the ordinance. It properly issued the DNS.

---

[2] The ludicrous premise of appellants' argument is that WATVs will go to the expense of making their vehicles road-worthy, undergo inspection, obtain both an operator's license and a vehicle license that identifies the operator, and then use their ability to share the road legally with cars in order to facilitate illegal off-road activities even while (apparently) obeying current strictures against using ORVs on county roads. This premise also ignores the fact that these ORV scofflaws currently could lawfully carry their ORVs on trailers on the county roads to facilitate the feared off-road damage. Appellants offer no evidence that the road usage changes will bring about such behavioral changes. The county gave the argument much more thoughtful consideration than it needed to give.

4

There are many good policy reasons not to have automobiles and WATVs share the same road.[3] Those concerns were heard, but the county decided to follow the state's lead and permit the WATVs on its roads. However, the county should not have to consider the environmental costs of behavior unrelated to its road usage ordinance. Only the environmental costs imposed by adding WATVs to the traffic mix on county roads were relevant. What those riders might do in violation of other laws, whether by riding off-road or conducting a drive-by shooting, was irrelevant. This was a simple calculus problem of measuring the change brought about by the new ordinance and did not require the county to account for the potential sins of all ORV users. We would not countenance the police profiling ORV users in such a manner and we should not permit appellants to do it here.

The county did its job and properly issued the DNS. Because the majority reverses that decision on an irrelevant basis, I dissent.

Korsmo, J.

---

[3] When a road has a speed limit of 35 m.p.h. or less, it typically means that either traffic congestion or road conditions requires the lower limit. Mixing in the WATVs on these types of roads, even where the speeds of a WATV would not impede other traffic, will only worsen the problem at hand.

5